**UNITED STATES of America,**
**Plaintiff-Appellant,**

v.

**John Henry MORGAN,**
**Defendant-Appellee.**

No. 82–5766.

United States Court of Appeals,
Sixth Circuit.

Argued Aug. 2, 1984.

Decided Sept. 13, 1984.

Rehearing and Rehearing En Banc
Denied Nov. 27, 1984.

Wellford, Circuit Judge, filed concurring opinion.

W. Thomas Dillard, U.S. Atty., J. Edgar Schmutzer, Asst. U.S. Atty., Knoxville, Tenn., Patty Merkamp Stemler (argued), U.S. Dept. of Justice, Appellate Section, Criminal Div., Washington, D.C., for plaintiff-appellant.

J. Polk Cooley (argued), Rockwood, Tenn., for defendant-appellee.

Before KEITH, MARTIN and WELLFORD, Circuit Judges.

BOYCE F. MARTIN, Jr., Circuit Judge.

The United States appeals an order of the district court, 565 F.Supp. 9, granting a motion to suppress a .45 caliber pistol, model M–70, converted to fully automatic, which had not been registered in the National Firearms Registration and Transfer Record as required by 26 U.S.C. § 5861(d) and 5871. The pistol was taken when John Henry Morgan was arrested at his mother's home in Harriman, Tennessee on June 13, 1982. This matter is properly before the court pursuant to 18 U.S.C. § 3731.

During the evening on June 13, 1982, the Sheriff's Department of Morgan County, Tennessee, received a complaint about target shooting at Potter's Falls, a public park located in Morgan County. According to the complaint, several people were shooting into a clay bank inside the park. Responding to the complaint, Sheriff Roger Reynolds and officer Teddy Bells drove to the park in an unmarked car. As they approached the park, they heard what sounded like automatic weapons being fired. Inside the park, they saw five or six people, including Morgan, loading guns into the trunk of a blue Cadillac. Sheriff Reynolds approached them and told them a complaint had been received about guns being fired in the park. At the suppression hearing he testified that he also saw what appeared to be the folding stock for an automatic shoulder weapon being thrown into the trunk of the car. After telling them about the complaint, the Sheriff asked the group to leave the park, which they agreed to do.

As the Sheriff was leaving, he told Deputy Sheriff Bells that "we need to look in the trunk." They turned back in the direction of Morgan and his friends and observed the closing of the trunk. The Sheriff recorded the license number of the car which was an out-of-state plate beginning with the prefix "95." While still observing the preparations to leave by Morgan and his friends, an unidentified observer approached the officer and told them:

If you get out of the car and attempt to arrest these people they will shoot you. They have done made the comment that they will kill any law that tries to arrest them. The best thing you ought to do is to get out of here and go get some help.

He also told Sheriff Reynolds the trunk of the Cadillac was filled with machine guns, pistols, and shotguns.

The Sheriff then immediately left the park and radioed for reinforcements from the Morgan County Sheriff's office. Other deputies later returned to the park with Sheriff Reynolds. However, Morgan and his friends had left. An alert was then broadcast requesting a lookout for a blue Cadillac with an out-of-state license plate beginning with the prefix "95." Sheriff Reynolds warned in the alert that, based upon the information he had received from the unidentified bystander, the occupants were armed with automatic weapons and considered dangerous.

Sometime after Reynolds' dispatch, Officer Isham of the City of Harriman Police Department spotted the Cadillac and followed it to the home of Elizabeth Morgan, the mother of defendant Morgan. Isham observed several people get out of the car and take an assortment of weapons into the Morgan home. He then radioed Thomas Alcorn, Assistant Chief of the Harriman Police Department, who in turn contacted Sheriff Reynolds. Isham, along with Officer Steelman, who arrived shortly after Isham's radio dispatch to Chief Alcorn, remained on guard and unobserved outside the Morgan home waiting for the other officers to arrive. During this period, they observed no unusual or threatening activity around the house.

After receiving Isham's radio alert, Chief Alcorn and several of his officers met in a local coffee shop where they "assessed the situation." According to Chief Alcorn's testimony at the suppression hearing, he discussed the logistics of approaching the Morgan home and "gave [his] men their assignments and positioned everybody, and we moved from there." Before leaving the coffee shop, however, Chief Alcorn and his men waited for the arrival of the officers from Morgan County.

When Alcorn and his squad of nine officers, including Sheriff Reynolds and his deputies, arrived at the Morgan home, Chief Alcorn drove his car, with his lights off, into the yard and parked it to the rear and right of the Cadillac. At the same time, the other officers surrounded the Morgan home. Alcorn then flooded the house with spotlights and summoned Morgan from his mother's home with the blaring call of a bullhorn.

Responding to the coercive activity outside of the house, Morgan appeared at the front door holding a pistol in his hand. Alcorn ordered Morgan to put down the weapon. Morgan then raised the gun. Chief Alcorn repeated his order, and Morgan put the gun down inside the door and went outside. After leaving the house, Morgan was formally arrested, handcuffed, and frisked. During the frisk the police removed a loaded pistol from Morgan's right rear pocket. Those in the house were then called outside by Chief Alcorn. After they left, Chief Alcorn ran into the house and picked up the pistol left inside the door by Morgan. Two other officers then searched the whole house and found close to a dozen loaded guns inside the Morgan living room. These shotguns, rifles, and pistols were also seized by the police. The only weapon found to violate any statutory firearms requirement was the .45 caliber pistol found inside the door.

During the one- to two-hour period between Sheriff Reynolds' first observation of Morgan at Potter Falls and Morgan's subsequent arrest, no effort was made by any law enforcement agency to obtain a search or arrest warrant. When asked at the suppression hearing why he did not obtain a warrant from one of the judges available on the weekend, Chief Alcorn stated: "Well, generally—we have tried to, on several occasions, to contact the judges on the weekend and either one of the judges are hard to reach on the weekend."

The district court granted Morgan's motion to suppress the .45 caliber pistol seized by Chief Alcorn which was the only basis for federal charges against Morgan. The district court found no exigent circumstances justifying the police officers' warrantless entry and subsequent search of the Morgan home. In the opinion of the court, "there was sufficient time" to obtain an arrest or search warrant. Because we agree there were no exigent circumstances justifying the warrantless entry of the home and arrest of Morgan, we affirm the order of the district court.

■ Absent exigent circumstances, police officers may not enter an individual's home or lodging to effect a warrantless arrest or search. *Payton v. New York,* 445 U.S. 573, 590, 100 S.Ct. 1371, 1382, 63 L.Ed.2d 639 (1980). As clearly stated in *Payton,* 445 U.S. at 590, 100 S.Ct. at 1382:

> In terms that apply equally to seizures of property and to seizures of the person, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not be reasonably crossed without a warrant.

This is not a novel idea. As eloquently explained by Justice Jackson in *Johnson v. United States,* 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948),

> Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's home secure only in the discretion of police officers.... The right of officers to thrust themselves into a home is ... a grave concern, not only to the individual but to society which chooses to dwell in reasonable security and freedom from surveillance.

*See also Welsh v. Wisconsin,* —— U.S. ——, —— n. 10, 104 S.Ct. 2091, 2097 n. 10, 80 L.Ed.2d 732 (1984) (fourth amendment prohibits the police from making a warrantless night entry of a person's home in order to arrest him for violation of a nonjailable traffic offense). This principle has been consistently applied in this circuit. *United States v. Kinney,* 638 F.2d 941, 943 (6th Cir.), *cert. denied* 452 U.S. 918, 101 S.Ct.

3056, 69 L.Ed.2d 423 (1981); *United States v. Renfro*, 620 F.2d 569, 574 (6th Cir.), cert. denied, 449 U.S. 902, 101 S.Ct. 274, 66 L.Ed.2d 133 (1980); *United States v. Killebrew*, 560 F.2d 729, 733 (6th Cir.1977). Moreover, the burden is on the government to demonstrate exigency. *Vale v. Louisiana*, 399 U.S. 30, 34, 90 S.Ct. 1969, 1971, 26 L.Ed.2d 409 (1970); *McDonald v. United States*, 335 U.S. 451, 456, 69 S.Ct. 191, 193, 93 L.Ed. 153 (1948); *United States v. Killebrew*, 560 F.2d at 733. Also, a district court's factual finding on the existence of exigent circumstances will not be disturbed unless clearly erroneous. *United States v. Gargotto*, 510 F.2d 409, 411 (6th Cir.1974), cert. denied, 421 U.S. 987, 95 S.Ct. 1990, 44 L.Ed.2d 477 *reh. denied*, 423 U.S. 884, 96 S.Ct. 157, 46 L.Ed.2d 115 (1975); *United States v. Flickinger*, 573 F.2d 1349, 1356–57 (9th Cir.), *cert. denied*, 439 U.S. 836, 99 S.Ct. 119, 58 L.Ed.2d 132 (1978); *see also United States v. Collis*, 699 F.2d 832, 835 (6th Cir.), *cert. denied*, — U.S. —, 103 S.Ct. 3088, 77 L.Ed.2d 1349 (1983) (district court's finding on whether an illegal seizure has occurred subject to clearly erroneous test). In *United States v. Flickinger*, 573 F.2d at 1355, the court explained that the "[t]erm 'exigent circumstances,' in conjunction with an arrest in a residence, refers to a situation where the inevitable delay incident to obtaining a warrant must give way to an urgent need for immediate action." *See also United States v. Blake*, 632 F.2d 731, 733 (9th Cir.1980). Moreover, the critical time for determining whether exigency exists "is the moment of the warrantless entry by the officers" onto the premises of the defendant. *United States v. Killebrew*, 560 F.2d at 733.

■ The record here reveals no exigency sufficient to justify the warrantless entry of the home and arrest of Morgan. None of the traditional exceptions justifying abandonment of the warrant procedure are present here. The officers involved were not in hot pursuit of a fleeing suspect. *See United States v. Santana*, 427 U.S. 38, 42–43, 96 S.Ct. 2406, 2409, 49 L.Ed.2d 300 (1976); *Warden v. Hayden*, 387 U.S. 294, 298–99, 87 S.Ct. 1642, 1645–

46, 18 L.Ed.2d 782 (1967); *United States v. Williams*, 612 F.2d 735, 739 (3rd Cir.1979), *cert. denied*, 445 U.S. 934, 100 S.Ct. 1328, 63 L.Ed.2d 770 (1980) (warrantless entry upheld where officers first began surveillance having good cause to believe that they would need to wait only a few minutes before defendant exited from private residence). Chief Alcorn specifically testified that he and his officers had sufficient time to assemble at a local coffee shop where they "assessed the situation" and waited for Sheriff Reynolds' arrival before proceeding to the Morgan home. This fact directly contradicts the claim of the United States that the police officers involved here were in hot pursuit of Morgan from the time they first confronted him in Potters Falls until the time his Cadillac was spotted next to his mother's home. The "hot pursuit" exception to a warrant requirement may not be invoked merely because police officers find it inconvenient to obtain a warrant before proceeding with an arrest. On the contrary, the "hot pursuit" exception is reserved for situations where speed is essential to protect a compelling governmental interest. *Hayden v. Warden, supra*, 387 U.S. at 298–99, 87 S.Ct. at 1645–46; *United States v. Elkins*, 732 F.2d 1280, 1285 (6th Cir.1984). Here, the facts indicate that the officers did not feel an "urgent need for immediate action." *United States v. Flickinger, supra*, 573 F.2d at 1355. "Where, as here, officers are not responding to an emergency, there must be compelling reasons to justify the absence of a search [or arrest] warrant." *McDonald v. United States*, 335 U.S. 451, 454, 69 S.Ct. 191, 193, 93 L.Ed. 153 (1948).

Nor was this a situation where a suspect represented an immediate threat to the arresting officers or the public which justified the absence of a warrant. The United States argues no warrant was required because the police conduct constituted a "cursory safety check," which is a recognized exception to the warrant requirement. *See United States v. Kolodziej*, 706 F.2d 590, 596–97 (5th Cir.1983) (and cases cited therein). We disagree. To satisfy the cursory

safety check exception "the government must show that there was 'a serious and demonstrable potentiality for danger.'" *United States v. Kolodzeij, supra,* 706 F.2d at 596, quoting *United States v. Smith,* 515 F.2d 1028, 1031 (5th Cir.1975) (per curiam), *cert. denied,* 424 U.S. 917, 96 S.Ct. 1119, 47 L.Ed.2d 322 (1976). The record in this case reveals no such immediate threat or security risk to the officers involved here. As found by the district court, the evidence "shows that the occupants of the [Morgan] house were peaceful until startled by Officer Alcorn's car coming up their driveway in a clandestine manner." Moreover, Morgan's prior contact with police officials had been friendly and cooperative. There was no substantiated evidence that Morgan was dangerous or that a grave offense or crime of violence had occurred or was even threatened. *United States v. Killebrew,* 560 F.2d at 734. Other than the unconfirmed information supplied to Sheriff Reynolds by an unidentified person, the police officers could point to no other substantiated evidence that indicated Morgan or his companions posed an impending threat to the police or to the public. Indeed, all the proven evidence indicates Morgan and his friends posed no risk to anyone until the police officers surrounded the Morgan home and flooded it with high-powered spotlights. *See United States v. Hatcher,* 680 F.2d 438, 444 (6th Cir.1982) (government failed to show evidence indicating that defendant was a dangerous individual to justify warrantless "protective sweep" of defendant's home). We believe that looking at the totality of the circumstances, the district court was correct in concluding that the facts did not indicate any risk to justify a warrantless entry into the Morgan home. *See United States v. Killebrew, supra,* (where there were no facts indicating occupant was dangerous or about to escape, warrantless entry into suspect's motel room violated fourth amendment, even though police knew occupant possessed a gun); *see also United States v. Gamble,* 473 F.2d 1274, 1277 (7th Cir.1973). To justify this type of warrantless intrusion, po-

lice officers "must be able to point to specific and articulable facts which, taken together with other rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968). Police officials, however, are not free to create exigent circumstances to justify their warrantless intrusions. *United States v. Allard II,* 634 F.2d 1182, 1187 (9th Cir.1980); *United States v. Allard I,* 600 F.2d 1301, 1304 n. 2 (9th Cir.1979) ("If exigent circumstances were created, they resulted from the agent's own conduct.")

Finally, there can be no claim that immediate police action was needed to prevent the destruction of vital evidence or thwart the escape of known criminals. *See Warden v. Hayden, supra; United States v. Butler,* 533 F.2d 221, 223–24 (5th Cir.1976) (per curiam), *cert. denied,* 434 U.S. 865, 98 S.Ct. 200, 54 L.Ed.2d 141 (1977). Morgan and his friends were peacefully occupying a private home in the evening until they were alarmed by the surreptitious police approach and the bright lights. There is absolutely no evidence in the record that Morgan or his friends were engaged in the destruction of evidence or about to remove contraband to another jurisdiction.

■ In sum, there were no exigent circumstances justifying the warrantless intrusion by the police onto the Morgan property. As Chief Alcorn testified, Morgan's arrest was a planned occurrence, rather than the result of an ongoing field investigation. *See Welsh v. Wisconsin,* —— U.S. at ——, 104 S.Ct. at 2099 (hot pursuit exception to warrant requirement rejected "because there was no immediate or continuous pursuit of the [defendant] from the scene of the crime"); 2 W. La Fave, Search and Seizure § 6.1(c) pp. 386–392. *Cf. Coolidge v. New Hampshire,* 403 U.S. 443, 471, n. 27, 91 S.Ct. 2022, 2041, n. 27, 29 L.Ed.2d 564 (1971) (plurality opinion). Therefore, a warrant should have been obtained before proceeding to the Morgan home. Arguably, Morgan's activities in the park may have provided probable cause for the issuance of a warrant. This, however, can

not excuse the failure to secure a warrant. Police officers may not, in their zeal to arrest an individual, ignore the fourth amendment's warrant requirement merely because it is inconvenient. *Johnson v. United States,* 333 U.S. 10, 15, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948). Absent exigent circumstances, the privacy of a home may not be invaded without a warrant. *Payton v. New York,* 445 U.S. at 590, 100 S.Ct. at 1382.

As an alternative justification for its actions, the United States argues that the facts here, "at the very least," provided the reasonable suspicion of a weapons violation necessary to support a brief investigatory stop of Morgan and his group. *See Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The government then contends that once Morgan appeared at the door holding a weapon in plain view, the police were justified in immediately arresting him and seizing the weapon. Even assuming the validity of this legal theory,[1] the police conduct outside of the Morgan home cannot be characterized as a brief investigatory stop. On the contrary, the record provides ample proof that, "as a practical matter, [Morgan] was under arrest," *Florida v. Royer,* 460 U.S. 491, 503, 103 S.Ct. 1319, 1327, 75 L.Ed.2d 229, 240 (1983) (plurality opinion), as soon as the police surrounded the Morgan home, and therefore, the arrest violated *Payton* because no warrant had been secured. The police show of force and authority was such that a "reasonable person would have believed he was not free to leave." *United States v. Mendenhall,* 446 U.S. 544, 554–55, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980), (opinion of Stewart, J.); *United States v. Robinson,* 650 F.2d 537, 538 (5th Cir.1981). To describe the encounter between the police and Morgan as a "brief investigatory stop" ignores the facts of this case. Nine police officers and several patrol cars approached and surrounded the Morgan residence in the dark. The officer in charge strategically positioned his car in the driveway in front of the Morgan home blocking any movement of his car. The police then called for Morgan to come out of the house. "These circumstances surely amount to a show of official authority such that 'a reasonable person would have believed he was not free to leave.'" *Florida v. Royer,* 460 U.S. at 501–503, 103 S.Ct. at 1326–1327 (plurality opinion), *id.* at 1330 (Brennan, J., concurring in result), *id.* at 1332–1333 (Blackmun, J., dissenting), quoting *United States v. Mendenhall,* 446 U.S. at 554, 100 S.Ct. at 1877 (opinion of Stewart, J.). Viewed objectively, Morgan was placed under arrest, without the issuance of a warrant, at the moment the police encircled the Morgan residence.

The government's reliance on *Washington v. Chrisman,* 455 U.S. 1, 102 S.Ct. 812, 70 L.Ed.2d 778 (1982), is misplaced. In *Chrisman,* the Court held it reasonable for a police officer to monitor the movements of a person *lawfully* arrested, even if it resulted in a warrantless entry into a residence. *Id.,* 102 S.Ct. at 817. However, the reasoning of *Chrisman* does not apply here for two reasons. First, the initial detention in *Chrisman* was a lawful arrest; here Morgan's arrest was unlawful because there was no warrant for his arrest. Secondly, in *Chrisman* the person initially arrested invited the police officer to accompany him to his dormitory room. This in turn led to the observation of contraband in the dorm room and resulted in the prosecution of his roommate, Chrisman. Here, Morgan did not invite anyone anywhere. As far as this record indicates, he knew nothing of the investigation undertaken by Chief Alcorn.

---

**1.** As pointed in *Davis v. Mississippi,* 394 U.S. 721, 726–27, 89 S.Ct. 1394, 1397, 22 L.Ed.2d 676 (1969), "the Fourth Amendment was meant to prevent wholesale intrusions upon the personal security of our citizenry, whether these intrusions be term 'arrests' or 'investigatory detentions.'" And the Court has rejected "the notions that the Fourth Amendment does not come into play at all as a limitation upon police conduct if the officers stop short of something called a 'technical arrest or a full-blown search.'" *Terry v. Ohio,* 392 U.S. at 19, 88 S.Ct. at 1879, *quoted in Davis v. Mississippi,* 394 U.S. at 727, 89 S.Ct. at 1397. Thus labeling the police conduct as an investigatory stop does not preclude constitutional scrutiny of the police conduct here.

Nor do the Court's recent holdings in *United States v. Leon,* —— U.S. ——, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), and *Segura v. United States,* —— U.S. ——, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984), affect the result in this case. *Leon* held that the fourth amendment's exclusionary rule should not be utilized to bar the use of evidence obtained by officers acting in reasonable reliance on a search warrant issued by a magistrate which was later determined to be invalid. *Segura v. United States* concerned whether, "because of an earlier illegal entry, the [f]ourth [a]mendment requires suppression of evidence seized later from a private residence pursuant to a valid search warrant which was issued on information obtained by the police before the entry into the residence." *Id.,* at ——, 104 S.Ct. at 3382. The *Segura* Court decided that the evidence obtained pursuant to the search warrant should not have been suppressed because the "warrant and information on which it was based were unrelated to the (earlier illegal) entry and therefore constituted an independent source for the evidence under *Silverthorne Lumber Co. v. United States,* 251 U.S. 385 [40 S.Ct. 182, 64 L.Ed. 319] (1920)." *Segura,* —— U.S. at ——, 104 S.Ct. at 3383. Here, it is undisputed that the officers did not have a search or arrest warrant, nor were they in the process of obtaining such a warrant.

The government, however, maintains that with or without exigent circumstances, no warrant was needed to call Morgan out of his home. The cases cited by the government in support of this claim, *United States v. Renfro, supra,* 620 F.2d at 574–75, *McGeehan v. Wainwright,* 526 F.2d 397 (5th Cir.), *cert. denied,* 425 U.S. 997, 96 S.Ct. 2214, 48 L.Ed.2d 823 (1976), *United States v. Herring,* 582 F.2d 535, 543 (10th Cir.1978), and *United States v. Smith,* 515 F.2d at 1031–32, do not support this argument. *Renfro* involved police officers forcibly entering the home of suspects wanted for serious felonies. The forcible entry in *Renfro* was necessitated by the suspects' apparent destruction of evidence. No such destruction of evidence was

present here. *Herring* involved the peaceful arrest of a suspect outside of his motel as he responded to the knocks of the arresting officers. The arrest here was hardly peaceful. Moreover, to the extent that the *Herring* court validates the warrantless arrest of an individual standing in the doorway of a private residence absent exigent circumstances, we believe the rule of *Payton v. New York,* would compel a contrary result had *Herring* been decided subsequent to the *Payton* decision. *McGeehan,* decided prior to *Payton,* involved the unplanned, warrantless arrest of robbery suspects located inside a trailer home shortly after the police had received information identifying the suspects and their escape car. Here, the arrest of Morgan was a planned event; it was not the result of an ongoing field investigation. *Smith,* also decided prior to *Payton,* involved the arrest of a suspect, based on a valid warrant, who was discovered by police inside his mobile home. None of these cases support the assertion that police officers may arouse and seize a citizen, peacefully residing in the privacy of his home, without exigent circumstances to support the intrusion. In fact, the Supreme Court has repeatedly rejected the claim that police may arbitrarily invade an individual's expectation of privacy. The Court has declared that "[a]t the very core [of the fourth amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Silverman v. United States,* 365 U.S. 505, 511, 81 S.Ct. 679, 682, 5 L.Ed.2d 784 (1961). To protect this important right, the framers of the amendment required that judicial approval be obtained before police be allowed to intrude into the privacy of the home, absent exigent circumstances. *McDonald v. United States,* 335 U.S. 451, 455–56, 69 S.Ct. 191, 193, 93 L.Ed. 153 (1948); *Johnson v. United States,* 333 U.S. at 13–14, 68 S.Ct. at 368–369. Therefore, arbitrary governmental intrusions into the sanctity of the home are the prime evils the fourth amendment was designed to deter.

The government further argues that the rule of *Payton* is inapplicable here because the officers in question did not cross the threshold until Morgan was arrested after appearing at the door with gun in hand. We disagree. In *Payton v. New York,* police officers, with probable cause to arrest, knocked on the door of Obie Riddick's apartment. After Riddick's three-year-old son opened the door, the police could see Riddick sitting in bed. The police then entered the residence and arrested Riddick. *Payton,* 445 U.S. at 578, 100 S.Ct. at 1376. In finding this arrest invalid, the Supreme Court held that, absent exigent circumstances, warrantless intrusions into a suspect's home are unconstitutional. Similarly, in *United States v. Johnson,* 626 F.2d 753 (9th Cir.1980), *aff'd on other grounds,* 457 U.S. 537, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982), FBI agents, using fictitious names, knocked on the door of Raymond Johnson with their guns drawn. When Johnson opened the door, the agents identified themselves and asked to talk to Johnson. Johnson invited them in. After the agents were inside, they arrested Johnson. The Ninth Circuit, relying on the rule of *Payton,* held "the arrest of Johnson, while he *stood within the door of his home,"* violated the fourth amendment because no warrant had been obtained and no exigent circumstances existed to justify the warrantless intrusion. *United States v. Johnson,* 626 F.2d at 757 (emphasis added). The court specifically noted that

> [i]n this case, we are confronted with the situation where the suspect was arrested as he stood inside his home with drawn weapons. In these circumstances, it is the location of the arrested person, and not the arresting agents, that determines whether an arrest occurs within a home.

Otherwise, arresting officers could avoid illegal "entry" into a home simply by remaining outside the doorway and controlling the movements of suspects within through the use of weapons that greatly extend the "reach" of the arresting officers.

*United States v. Johnson,* 626 F.2d at 757.[2] We agree with the Ninth Circuit that the important consideration in this type of case "is the location of the arrested person, and not the arresting agent, that determines whether an arrest occurs within a home."

Applying this rule here, it is undisputed that Morgan was peacefully residing in his mother's home until he was aroused by the police activities occurring outside. Morgan was then compelled to leave the house. Thus, as in *Johnson, supra,* "it cannot be said that [Morgan] voluntarily exposed himself to a warrantless arrest" by appearing at the door. On the contrary, Morgan appeared at the door *only because of* the coercive police behavior taking place outside of the house. *See Johnson v. United States,* 333 U.S. at 13, 68 S.Ct. at 368 (police entry to defendant's living quarters "granted in submission to authority rather than as an understanding and intentional waiver of a constitutional right"). Viewed in these terms, the arrest of Morgan occurred while he was present inside a private home. Although there was no direct police entry into the Morgan home prior to Morgan's arrest, the constructive entry accomplished the same thing, namely, the arrest of Morgan. Thus, the warrantless arrest of Morgan, as he stood within the door of a private home, after emerging in response to coercive police conduct, violated Morgan's fourth amendment rights. A contrary rule would undermine the constitutional precepts emphasized in *Payton.*

**2.** In *United States v. Whitten,* 706 F.2d 1000, 1015 (9th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 1593, 80 L.Ed.2d 125 (1984), and *United States v. Botero,* 589 F.2d 430, 432 (9th Cir. 1978), *cert. denied,* 441 U.S. 944, 99 S.Ct. 2162, 60 L.Ed.2d 1045 (1979), the Ninth Circuit has interpreted *United States v. Santana,* 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976), to allow the warrantless arrest of an individual as he stands in the doorway of a private residence.

However, in *Botero* the court found sufficient exigency to justify the warrantless entry and arrest of the defendant. *United States v. Botero,* 589 F.2d at 432. To the extent that *Whitten* validates the warrantless arrest of individuals standing in the doorway of a private residence absent exigent circumstances, we believe that this holding is contrary to the rule established in *Payton.*

*See United States v. McCool*, 526 F.Supp. 1206, 1209 (M.D.Tenn.1981) ("to uphold warrantless arrests at a person's home whenever law enforcement officers successfully obtain his presence at a door too readily allows subversion of the *Payton* principle"). And because Morgan's arrest was unlawful, any evidence seized incident to that arrest was obtained illegally and therefore must be suppressed. *Payton v. New York, supra; Davis v. Mississippi*, 394 U.S. 721, 724, 89 S.Ct. 1394, 1396, 22 L.Ed.2d 676 (1969); *Taylor v. United States*, 286 U.S. 1, 5 (1932).

■■■■■ Finally, the warrantless seizure of Morgan's gun cannot be supported by the "plain view" doctrine. The "plain view" doctrine permits the warrantless seizure of private possessions where three requirements are satisfied:

First, the police officer must lawfully make an "initial intrusion" or otherwise properly be in a position from which he can view a particular area. Second, the officer must discover incriminating evidence "inadvertently," which is to say, he may not "know in advance the location of [certain] evidence and intend to seize it," relying on the plain view doctrine only as a pretext. Finally, it must be "immediately apparent" to the police that the items they observe may be evidence of a crime, contraband, or otherwise subject to seizure.

*Texas v. Brown*, 460 U.S. 730, 737, 103 S.Ct. 1535, 1540, 75 L.Ed.2d 502 (1983) (citations omitted) (plurality opinion); *Coolidge v. New Hampshire*, 403 U.S. 443, 465–70, 91 S.Ct. 2022, 2037–40, 29 L.Ed.2d 564 (1971) (plurality opinion). Here the facts fail to satisfy the first prong of the "plain view" doctrine because the police officers in this case did not "lawfully make an 'initial intrusion' or [were not] otherwise ... properly in a position" from which an item of contraband could be viewed. The appearance of the police and the arrest of Morgan was not the result of any exigency authorizing the police presence. Thus, the police were not "lawfully engaged" in legitimate police activities at the moment the object in question came into "plain view." *Texas v. Brown*, 103 S.Ct. at 1541. "The primary requisite for ... application of the plain view doctrine is that the police officer has a right to be where he is when he sees the evidence." *United States v. Blalock*, 578 F.2d 245, 248 (9th Cir.1978). Moreover, even assuming that the police officers were rightfully in a position to view the gun, the "plain view" doctrine does not authorize warrantless entries into a private home merely because an item of contraband has become visible to those outside. As stated by Justice Stewart in *Coolidge, supra:*

[P]lain view *alone* is never enough to justify the warrantless seizure of evidence. This is simply a corollary of the familiar principle discussed above, that no amount of probable cause can justify a warrantless search or seizure absent "exigent circumstances." Incontrovertible testimony of the senses that an incriminating object is on premises belonging to a criminal suspect may establish the fullest possible measure of probable cause. But even where the object is contraband, this Court has repeatedly stated and enforced the basic rule that the police may not enter and make a warrantless seizure. *Taylor v. United States*, 286 U.S. 1, 52 S.Ct. 466, 76 L.Ed. 951; *Johnson v. United States*, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436; *McDonald v. United States*, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153; *Jones v. United States*, 357 U.S. 493, 497–498, 78 S.Ct. 1253, 2 L.Ed.2d 1514; *Chapman v. United States*, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828; *Trupiano v. United States*, 334 U.S. 699, 82 S.Ct. 1229, 92 L.Ed. 1663.

*Coolidge, supra*, 403 U.S. at 486, 91 S.Ct. at 2048 (emphasis in original; footnote omitted). Here, the conduct of the police went beyond permissible bounds. Because the initial intrusion by the police was illegal, any evidence or contraband discovered as a result of that intrusion was illegally obtained. *United States v. Williams*, 604 F.2d 1102, 1123 (8th Cir.1979); *United States v. Cisneros*, 448 F.2d 298, 303 n. 6 (9th Cir.1971) ("Assuming a valid basis for

arrest, an illegal method of execution, for instance an unlawful forcible entry, can result in the exclusion of any evidence obtained as a result of the officer's illegal conduct.").

As recently confirmed by the Court, the privacy of the home "deserve[s] the most scrupulous protection from governmental invasion." *Oliver v. United States,* —— U.S. ——, ——, 104 S.Ct. 1735, 1741, 80 L.Ed.2d 214 (1984); *See also United States v. Karo,* —— U.S. ——, ——, 104 S.Ct. 3296, 3302, 82 L.Ed.2d 530 (1984); *Welsh v. Wisconsin, supra.* The warrant requirement of the fourth amendment is not a ritual which can be ignored because it may be inconvenient.

> We are not dealing with formalities. The presence of a search warrant serves a high function. Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police.... [T]he Constitution requires a magistrate to pass on the desires of the police before they violate the privacy of the home. We cannot be true to that constitutional requirement and excuse the absence of a search warrant without a showing by those who seek exemption from the constitutional mandate that the exigencies of the situation made that course imperative.

*McDonald v. United States,* 335 U.S. 451, 456, 69 S.Ct. 191, 193, 93 L.Ed. 153 (1948). The Supreme Court has repeatedly "underscored the essential purpose of the Fourth Amendment to shield the citizen from unwarranted intrusions into his privacy." *Jones v. United States,* 357 U.S. 493, 498, 78 S.Ct. 1253, 1256, 2 L.Ed.2d 1514 (1958). And the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. United States District Court,* 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752 (1972). The police officers here violated this constitutional principle. Accordingly, we find that Morgan was illegally arrested when the police surrounded the Morgan home and utilized coercive tactics and physical restraints which induced his presence at the door. And because this conduct was not justified by a valid warrant or exigent circumstances, the subsequent police seizure of the gun placed inside of the door by Morgan was illegally obtained, and therefore, properly suppressed.

The judgment of the district court is affirmed.

WELLFORD, Circuit Judge, concurring.

I concur with the result reached and some of the reasoning of my brothers in this case. I write separately to express my view that under the circumstances known to the police officers concerning the very recent use and/or possession of suspected illegal weapons by defendant (and others) in a public park, there was no need for a warrant to enter on Morgan's mother's property to investigate and to attempt to question Morgan about his knowledge and/or involvement in the episode. Had the officers not used overly coercive tactics to draw Morgan out of the home thereby indicating an intent to place him under custody equivalent to an arrest, I would hold that the seizure in question was appropriate.

I find it unnecessary to decide whether a suspect standing in the doorway of a private residence responding to a reasonable police investigation or inquiry may thereafter be arrested without a warrant in the course of the interview. I doubt that *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), *supra,* is applicable here because the officers did not enter into the mother's home to arrest Morgan without a warrant.

To the extent the majority's holding is limited to a conclusion that Morgan was, in effect, compelled to leave his mother's house by coercive police conduct not justified by exigent circumstances at the time, bringing about an apparently intended warrantless arrest, I concur. I think we need go no further. The seizure of the gun, despite its being in "plain view," was part and parcel of the improper warrantless ar-

rest situation, and I therefore would affirm the judgment of suppression.