NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0385n.06

No. 19-4057

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Jun 30, 2020
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| ANNE CRABBS, et al., | ) | |
| | ) | |
| Plaintiffs-Appellants, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE SOUTHERN |
| | ) | DISTRICT OF OHIO |
| RASHAD PITTS, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |

_____

**BEFORE: MOORE, SUTTON, and WHITE, Circuit Judges.**

**HELENE N. WHITE, Circuit Judge.** Plaintiffs James Crabbs and Anne Crabbs, individually, and as the representative of Keith Crabbs, their deceased son, appeal the judgment entered on a jury verdict in favor of Defendant Rashad Pitts and the denial of their motion for judgment as a matter of law (JMOL) in this action involving Pitts's entry into Plaintiffs' house without a warrant to arrest Keith Crabbs. The district court submitted the question whether the entry was justified by exigent circumstances to the jury, and the jury found that it was. Because the evidence was sufficient to support the verdict, we AFFIRM.

**BACKGROUND**

**I.      Factual Background as Presented to the Jury**

On the evening of September 30, 2014, the Delaware County Sheriff's Office received a 911 call from Roland D'Amato. Mr. D'Amato reported that his neighbor, Keith Crabbs, had just approached him and his wife in his car and had threatened to kill Mrs. D'Amato. Mr. D'Amato

told the dispatcher that he believed Crabbs had been arrested for murder sometime before, and that he was "unstable." (R. 178-4, PID 3922.)

Deputies Pitts, Wilson, Lee, and Elverson were dispatched to the D'Amatos' home. The dispatcher told the deputies that Crabbs had made threats of violence against the D'Amatos and had driven by the 911 caller at a high rate of speed. The dispatcher also told the deputies that Crabbs had been charged and acquitted of manslaughter and that he had an in-house caution alert against him because he had a history of threatening law enforcement officers.

When the deputies arrived at the D'Amatos' home, Mrs. D'Amato appeared "visibly shaken." (R. 176, PID 3743.) Mrs. D'Amato told the deputies that Crabbs had threatened to kill her while she was walking her dog. Mr. D'Amato told the deputies that Crabbs had driven by him at a high rate of speed. The D'Amatos stated that Crabbs "had not been right" since he was acquitted of manslaughter and that he had been harassing Mrs. D'Amato for years, including "mak[ing] erratic statements" and swearing at her when she was walking or driving by his house. (R. 176, PID 3759; R. 188, PID 4813-14.)

Mrs. D'Amato had recorded the incident on her iPhone and shared the video with the deputies. On the recording, a car horn can be heard honking repeatedly for several seconds. Mrs. D'Amato then approaches her neighbor's house and tells him that she came to his door because the man honking at her frightened her and was harassing her. As Mrs. D'Amato speaks with the neighbor, identified at trial as Jack Whitlinger, a man in the background shouts that he is going to "fucking kill that woman" and yells "call the Sheriff, Jack[,] and I'll kill you too, bitch." (R. 188, PID 4937, Ex. D11, 02:05-02:17.) At trial, Mrs. D'Amato testified that the car horn heard in the recording was Crabbs's and that it was Crabbs shouting threats at her and Whitlinger.

2

After interviewing the D'Amatos and Whitinger and reviewing the recording, Deputy Wilson determined that there was probable cause to arrest Crabbs for aggravated menacing[1] based on the threats against Mrs. D'Amato. By that time, the deputies had learned that Crabbs had a conceal and carry (CCW) permit.

The deputies left the D'Amatos' home and drove toward Crabbs's home, intending to arrest Crabbs. Deputies Lee and Elverson waited in their cars nearby while Pitts and Wilson knocked on the front door. Anne Crabbs, Keith Crabbs's mother, answered the door.[2] Pitts and Wilson asked Mrs. Crabbs where Keith was. Mrs. Crabbs told the officers that Crabbs was out but would be home soon.[3] The deputies asked Mrs. Crabbs if she would have him call when he returned, and she said yes.

Deputies Lee and Elverson tried to locate Crabbs while Pitts and Wilson returned to the D'Amatos' house to collect witness statements. While they were at the D'Amatos' house for the second time, Pitts and Wilson saw a black Cadillac speed toward Crabbs's home. They got in their cruisers, and Pitts followed Crabbs's car while Wilson drove in the opposite direction to block Crabbs in case he tried to drive away.

As Crabbs backed his car into his driveway, Pitts pulled in front of the driveway and turned on his emergency lights to initiate a stop. Pitts testified that instead of stopping, Crabbs exited his car quickly and was "blading"—touching or looking at the area where his weapon was on his body to make sure it was there—as he exited his car. (R. 176, PID 3799.) The dashcam video from

---

[1] Aggravated menacing is a first-degree misdemeanor in Ohio. O.R.C. § 2903.21. It is defined as "knowingly caus[ing] another to believe that the offender will cause serious physical harm to the person or property of the other person, the other person's unborn, or a member of the other person's immediate family." *Id.*

[2] Keith Crabbs lived at the home with his parents and grandmother.

[3] The parties disagree as to what Anne Crabbs told the deputies. Anne Crabbs testified that she told the deputies that Keith was out visiting friends, going to the mechanic, and getting tobacco. Deputy Pitts testified that Ms. Crabbs told them only that Keith was out getting tobacco.

Pitts's cruiser is consistent with Pitts's account of these events: as Pitts's vehicle parks in front of Crabbs's driveway, Crabbs quickly exits his car; Crabbs looks very briefly toward Pitts's cruiser, turns away, and walks quickly toward the house's front door; as Crabbs walks toward the door, he briefly touches or brushes his hand against the right side of his waist.

Pitts testified that he yelled multiple times for Crabbs to stop and that Crabbs ignored his commands. Again, the video is consistent with Pitts's account of the incident: Pitts yells for Crabbs to stop and Crabbs continues walking toward his front door; Pitts walks quickly toward Crabbs with his gun raised as he commands Crabbs to stop for a second time; Crabbs then turns toward Pitts and stops. At trial, Pitts testified that he pulled his weapon out because he believed that Crabbs likely had a weapon and was concerned that Crabbs was ignoring his commands.

Because Pitts left his microphone in his cruiser when he followed Crabbs toward the door, the audio on the recording is indiscernible beyond Pitts's initial calls for Crabbs to stop. Pitts testified that as he approached Crabbs at the front door, Crabbs said, "[f]uck you. I ain't going to jail. . . . I got a gun and you ain't doing shit about it." (R. 176, PID 3801.) Plaintiffs dispute that Crabbs said he had a gun, pointing to Pitts's deposition testimony that Crabbs did not tell him whether he had a weapon.[4]

After Crabbs stopped in front of the door, he and Pitts engaged in an exchange. Pitts told Crabbs "I just need to talk to you," and Crabbs stated that he "knows his rights" and that "we don't need to be on [my] property." (R. 187, PID 4765-66.) Pitts did not tell Crabbs that he was under arrest because "if I said he was going to jail, things would have definitely escalated even more." (R. 176, PID 3814.) Pitts testified that Crabbs was agitated and "cussing at [him]." (R. 187, PID 4746.) However, he also testified that Crabbs eventually showed him his hands and seemed to

---

[4] At his deposition, Pitts testified only that he believed that "this would be a very serious situation with him not listening to my commands, threatening people. I did not want him to get inside that house." (R. 189, PID 5004.)

"calm[] down a little bit," and that he re-holstered his firearm because he believed that Crabbs "wasn't posing a threat at that time." (R. 176, PID 3836-37.)

The dashcam video shows that this exchange lasted for about twenty-five seconds, after which Crabbs turned away from Pitts and reached toward the door.[5] With his hand on the door, Crabbs looked briefly back toward Pitts, then turned back toward the door, pushed it open quickly, and began to walk inside.

Pitts testified that he grabbed Crabbs's arm while he (Pitts) was still outside the threshold of the door to stop him from going inside. The dashcam video confirms that Pitts grabbed Crabbs's arm as Crabbs pulled away and moved through the door. Pitts testified that he grabbed Crabbs because "[a]t that time he posed a threat. Like I said, he already threatened two people. He was not listening to my commands. I saw the bulge in his [pants]. He was blading . . . . I didn't know what he was going to do when he got in the house." (R. 176, PID 3839.) He testified that as Crabbs pulled away, he followed him into the house and grabbed him by the shirt. The dashcam video shows that Pitts entered the house within one second of Crabbs. Deputy Wilson entered the house a few seconds later.

Inside the house, the deputies tased Crabbs and placed him under arrest.

---

[5] The parties dispute whether Anne Crabbs was at the door when Keith Crabbs entered. Pitts testified that Anne Crabbs came to the door and "was by the glass looking through the glass." (R. 187, PID 4758.) Pitts testified that he told her that he would "get with her in a minute," and that she then opened the first of two doors. (*Id.*) Pitts testified that Crabbs then opened the second door and tried to run into the house. Anne Crabbs testified that she was walking toward the front door but had not reached it when Keith opened it and walked inside. It is not clear from the video whether Anne Crabbs was in fact at the door, but this issue does not change our analysis.

## II.      Procedural History

Plaintiffs brought this action against the Delaware County Sheriff and several Delaware County deputies, including Pitts, asserting various claims.[6]  As relevant to this appeal, Plaintiffs alleged that the deputies' warrantless entry into the Crabbs's home constituted an unconstitutional search and seizure in violation of the Fourth Amendment.  The district court denied summary judgment to both parties on that claim.[7]

Plaintiffs proceeded to trial on several claims, including the unconstitutional-entry claim against Defendants Pitts, Wilson, and Lee.  At trial, Plaintiffs made two oral motions for judgment as a matter of law on the unconstitutional entry claim against Pitts pursuant to Federal Rule of Civil Procedure 50.  The district court denied both motions on the basis that Defendants had presented evidence which, if believed, could lead a jury to find that Pitts was in fear for his or others' safety when he entered the home, thereby justifying his entry.[8]

The jury returned a verdict for Defendants on all claims, and the court entered judgment in their favor.  Plaintiffs filed a post-trial motion for judgment as a matter of law on their unconstitutional entry claim against Pitts.  Plaintiffs also moved for a new trial under Rule 59(a) on that claim, arguing that the verdict was against the weight of the evidence and that the court's jury instructions were erroneous.  The district court denied both motions, again finding that a jury could conclude that exigent circumstances justified Pitts's entry into Plaintiffs' home.

---

[6] Keith Crabbs passed away after filing this lawsuit but before trial, and Anne Crabbs was substituted as his representative.

[7] The district court also rejected Defendants' hot-pursuit defense at summary judgment.

[8] Plaintiffs' first motion sought judgment as a matter of law against Deputies Pitts and Wilson.  In their second motion, Plaintiffs moved for judgment as a matter of law only against Pitts, agreeing to the dismissal of their unconstitutional entry claim against Wilson and Lee.

Plaintiffs appeal the judgment as to Defendant Pitts and the district court's denial of their motion for judgment as a matter of law.

## STANDARD OF REVIEW

We review de novo the denial of a motion for judgment as a matter of law made pursuant to Federal Rule of Civil Procedure 50(b). *Barnes v. City of Cincinnati*, 401 F.3d 729, 736 (6th Cir. 2005). "Judgment as a matter of law may only be granted if, when viewing the evidence in a light most favorable to the non-moving party, giving that party the benefit of all reasonable inferences, there is no genuine issue of material fact for the jury[] and reasonable minds could come to but one conclusion in favor of the moving party." *Id.* (citing *Gray v. Toshiba Am. Consumer Prods., Inc.*, 263 F.3d 595, 598 (6th Cir. 2001). In making this determination, "[t]he evidence should not be weighed, and the credibility of witnesses should not be questioned. The judgment of this court should not be substituted for that of the jury.'" *Balsley v. LFP, Inc.*, 691 F.3d 747, 757 (6th Cir. 2012) (quoting *Williams v. Nashville Network*, 132 F.3d 1123, 1131 (6th Cir. 1997)).

## DISCUSSION

Plaintiffs argue that they are entitled to judgment as a matter of law because (1) under *Payton v. New York*, 445 U.S. 573 (1980), exigent circumstances cannot justify a warrantless entry made to effect an arrest; and (2) the evidence was insufficient to support the jury's finding that exigent circumstances existed.

## I.

Plaintiffs first argue that under *Payton v. New York*, this court must find Pitts's warrantless entry unconstitutional without regard to whether exigent circumstances were present. In *Payton*, the Court addressed the then-unsettled question whether officers may enter a suspect's home without a warrant to make a routine felony arrest. 445 U.S. at 575-76. The Court held that

7

warrantless entries made to effect routine felony arrests violate the Fourth Amendment. *Id.* at 576. The Court explained, however, that the case presented "no occasion to consider the sort of emergency or dangerous situation, described in our cases as 'exigent circumstances,' that would justify a warrantless entry into a home . . . ." *Id.* at 583.

Plaintiffs argue that under *Payton*, Pitts's exigent-circumstances defense should not have been presented to a jury in the first place. Plaintiffs stress that, like the defendant-officers in *Payton*, Pitts admitted that he went to Crabbs's home to arrest him "for a crime alleged to have occurred a good deal earlier," and entered his home to make that arrest. (Appellants' Br. at 18.) According to Plaintiffs, these similarities require this court to find Pitts's entry into Crabbs's home unconstitutional.

*Payton* does not require us to ignore Pitts's exigent-circumstances justification merely because Pitts went to Crabbs's home to effect an arrest. The *Payton* Court did not hold that exigent circumstances may never justify warrantless entry into a suspect's home with the purpose of making an arrest. Nor did the Court hold that the particular factual circumstances in *Payton*—or circumstances similar to them—could never support an exigent-circumstances justification. To the contrary, the Court explained that "[a]lthough it is arguable that the warrantless entry to effect Payton's arrest might have been justified by exigent circumstances," it would decline to consider the issue because it had not been presented. 445 U.S. at 583. Because in this case Pitts did assert that exigent circumstances justified the entry, *Payton* does not preclude our review of the issue.

## II.

"[A]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." 445 U.S. at 589-90 (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)) (second alteration in original).

As the Court held in *Payton*, warrantless entries into a home are presumptively unreasonable. 445 U.S. 573 at 586. A warrantless entry may be lawful, however, if justified by exigent circumstances. *Hancock v. Dodson*, 958 F.2d 1367, 1375 (6th Cir. 1992). We have recognized three types of exigent circumstances: "(1) when the officers were in hot pursuit of a fleeing subject; (2) when the suspect represented an immediate threat to the arresting officers and public;" and (3) to prevent immediate destruction of evidence. *Id.* The burden is on the officer to establish that one or more of these circumstances existed. *Welsh v. Wisconsin*, 466 U.S. 740, 749-50 (1984). Whether exigent circumstances existed is a question of fact for the jury unless "the underlying facts are essentially undisputed" and "a finder of fact could reach but one conclusion." *Hancock*, 958 F.2d at 1375. The only issue on appeal is whether Pitts presented evidence sufficient for a jury to conclude that an immediate threat to officers or the public justified his warrantless entry. [9]

Officers asserting an immediate-threat defense must show that under the circumstances, "a reasonable officer could believe that there are 'real immediate and serious consequences that would certainly occur were a police officer to postpone action to get a warrant.'" *Barton v. Martin*, 949 F.3d 938, 948 (6th Cir. 2020) (quoting *Ewolski v. City of Brunswick*, 287 F.3d 492, 501 (6th Cir. 2002)). The circumstances must be viewed objectively, and the officer's subjective intent in entering the home is irrelevant. *Brigham City v. Stuart*, 547 U.S. 398, 404 (2006).

Pitts argues that the totality of the circumstances leading up to his entry into the Crabbs home could lead a reasonable officer to believe that Crabbs posed an immediate danger to himself, other officers, or occupants of the home. Pitts points out that when he entered the home, he knew that Crabbs had threatened to kill his neighbors, had a CCW permit, and had made threats against

---

[9] We do not address whether Pitts is entitled to qualified immunity because he has not raised the defense before us and, in any event, he appears to have forfeited the defense below. We note, however, that the jury's finding that there were exigent circumstances is tantamount to a finding that Pitts reasonably believed he was complying with clearly established law.

law enforcement in the past. Additionally, Crabbs ignored his calls to stop, appeared agitated and aggressive, and acted like he was carrying a weapon. Pitts also believed that Anne Crabbs was in the house and knew that other officers were on their way to the scene.

Pitts argues that these facts are substantially similar to those underlying *Ryburn v. Huff*, 565 U.S. 469 (2012) (per curiam). In *Ryburn*, officers learned that a high-school student had allegedly made threats to "shoot up" his school. *Id.* at 470. They learned that the student "had been absent from school for two days and that he was frequently subjected to bullying." *Id.* The officers went to the student's home for an interview and received no answer when they knocked on the door. *Id.* at 470-71. When they called the student's mother's cell phone, she answered and told them she was inside the house with her son and hung up the phone. *Id.* at 471. Shortly afterward, she and her son came out and stood on the front steps, where they refused the officers' request to have a discussion inside. *Id.* When the officers asked whether there were guns in the house, the mother ran inside and her son followed her. *Id.* The first officer to follow them inside stated that he "was 'scared because [he] didn't know what was in that house' and had 'seen too many officers killed.'" *Id.* (alteration in original). The Court found that "[j]udged from the proper perspective of a reasonable officer forced to make a split-second decision in response to a rapidly unfolding chain of events that culminated with [the mother] turning and running into the house after refusing to answer a question about guns, petitioners' belief that entry was necessary to avoid injury to themselves or others was imminently reasonable." *Id.* at 477.

As in *Ryburn*, Pitts responded to a threat of violence, and the situation evolved rapidly once he arrived at the Crabbs home. Like the respondents in *Ryburn*, Crabbs appeared evasive—he ignored Pitts's emergency lights and initial calls to stop and cut off his conversation with Pitts to go inside his home. Pitts explained that he "didn't know if [Crabbs] was going to hurt his family

10

or make a promise on the threat that he already did. I didn't want myself or any of my other deputies that I was working with to get hurt at that time."[10] (R. 189, PID 5007.)

Plaintiffs concede that Pitts presented evidence that Crabbs "(1) had earlier threatened two citizens, (2) was not listening to his commands, (3) was agitated, and (4) was likely armed." (Appellants' Br. at 31.) Nonetheless, Plaintiffs argue that this evidence fails to establish an immediate threat. Plaintiffs first point out that Crabbs *did* stop on the stoop to speak with Pitts. Second, they argue that the fact that Crabbs was armed is irrelevant because Pitts knew that Crabbs was licensed to carry a weapon. Third, they argue that "the claim that [Crabbs] was 'agitated' adds nothing to the analysis" because Crabbs never moved for his pistol and does not appear agitated in the dashcam video. (*Id.*) Finally, Plaintiffs challenge Pitts's testimony that Anne Crabbs appeared at the door during his exchange with Pitts, pointing out that she is not visible in the dashcam video.[11] Plaintiffs maintain that with this evidence discredited, a finding of exigent circumstances must rest on Pitts's assertion that he *believed* Crabbs posed an immediate threat, which is irrelevant to an objective inquiry.

The problem with Plaintiffs' arguments is that they ask this court to weigh conflicting evidence and assess the credibility of witnesses, which we may not do when reviewing a motion

---

[10] Plaintiffs discuss two non-binding cases that they argue are more analogous to this case than *Ryburn*: *McCoy v. Burns*, 756 F. Supp. 2d 868 (S.D. Ohio 2010), and *Bonivert v. City of Clarkston*, 883 F.3d 865 (9th Cir. 2018). *McCoy* and *Bonivert* are factually distinguishable from this case because neither involved the presence of a gun, and the plaintiffs in both cases were inside their homes when the officers confronted them and entered. *See McCoy*, 756 F. Supp. 2d at 872-74; *Bonivert*, 883 F.3d at 868, 870-71. More importantly, the issue in both cases was whether the defendants were entitled to summary judgment on their exigent-circumstances defense, not whether the plaintiffs were entitled to judgment as a matter of law. *McCoy*, 756 F. Supp. 2d at 874-75; *Bonivert*, 883 F.3d at 872. This difference in procedural posture is significant; the *McCoy* and *Bonivert* courts were tasked with determining whether, viewing the evidence in the light most favorable to the plaintiffs, there were triable issues of fact surrounding the exigent-circumstances question. *McCoy*, 756 F. Supp. 2d at 875; *Bonivert*, 883 F.3d at 872, 874. In contrast, here we must determine whether, viewing the evidence in the light most favorable to Pitts, the evidence is sufficient to support the jury's finding that exigent circumstances existed.

[11] The district court found that the video was "inconclusive" on this matter because the glass next to the door that Anne Crabbs allegedly looked through is partially out of frame or obscured. (R. 195, PID 5338.) Accordingly, the district court declined to discredit Pitts's testimony on the matter.

for judgment as a matter of law. *Balsley*, 691 F.3d at 757. Although a reasonable jury could have found, for instance, that Crabbs was not agitated, a jury could also have viewed the video and found that it corroborated Pitts's testimony that he was. Likewise, the jury could have considered the evidence that Crabbs was armed and that he initially ignored Pitts's calls for him to stop as contributing to circumstances that would cause a reasonable officer to believe there was a threat of imminent harm.

With respect to Crabbs's weapon, Plaintiffs argue that the presence of a weapon, on its own, does not create exigent circumstances, emphasizing that this court found no exigent circumstances where officers responded to a shots-fired call and saw the defendant in the window of his ex-wife's home holding a weapon. (Appellants' Br. at 31-32 (citing *United States v. Saari*, 272 F.3d 804, 806 (6th Cir. 2001)).) In *Saari*, the responding officers learned upon their arrival at the ex-wife's home that no shots had been fired and that the defendant seen with the weapon was always armed. *Id.* No threats were made. Days later, the officers went to the defendant's apartment without a warrant, ordered him to step outside, and searched the apartment. *Id.* at 806-07. We held that exigent circumstances did not justify the search and seizure because there was "no evidence that Defendant posed an immediate threat to the officers or the public at the time that the officers arrived at his apartment." *Id.* at 812. *See also United States v. Johnson*, 22 F.3d 674, 680 (6th Cir. 1994) ("The mere presence of firearms does not create exigent circumstances.").

*Saari* does not require a finder of fact to conclude that the presence of Crabbs's weapon was insignificant. If the only evidence Pitts presented to support his exigency defense was that Crabbs was armed, his defense would likely fail. But that is not the case, and a jury could properly determine that the fact that Crabbs was armed contributed to Pitts's perception that Crabbs posed

a threat. *See Gradisher v. City of Akron*, 794 F.3d 574, 584 (6th Cir. 2015) ("[A]dditional factors coupled with [evidence of a firearm] may be sufficient to justify a warrantless entry . . . .").

Finally, Plaintiffs argue that Pitts cannot claim that exigent circumstances existed because he and the other deputies controlled the timing of their encounter with Crabbs. Plaintiffs rely on *United States v. Morgan*, 743 F.2d 1158 (6th Cir. 1984), where officers responded to a complaint about target shooting in a public park and, upon arriving at the park, saw the defendant and others loading weapons into the back of a car. *Id.* at 1160. Officers asked the party to leave, and they agreed. *Id.* As the officers watched the party preparing to leave, an unidentified bystander approached and told the officers that members of the party had stated "that they will kill any law [enforcement officer] that tries to arrest them." *Id.* The sheriff put out an alert on the vehicle, which was later spotted by a local officer who followed the vehicle to the defendant's home. *Id.* The officer observed no unusual activity. *Id.* After the police chief was alerted by the observing officer of the defendant's location, the chief and other officers met at a coffee shop to "discuss[] the logistics of approaching the [defendant's] home" and wait for additional backup. *Id.* They later went to the defendant's home without a search or arrest warrant, coerced him from his home by surrounding it and flooding the home with spotlights, and seized a number of firearms found inside the home. *Id.* at 1161.

When asked during a suppression hearing why he did not attempt to get a search or arrest warrant in the hour or two between first spotting the defendant and arresting him, the sheriff explained that judges are generally "hard to reach on the weekend." *Id.* Citing the fact that the officers had time to meet at a coffee shop before arresting the defendant, we rejected the government's hot-pursuit justification. *Id.* at 1162. We also found that there was no evidence of an immediate threat to officers or others absent the unsubstantiated claims of the bystander. *Id.* at

1162-63.  Accordingly, we concluded that the officers' entry into and search of the home was unconstitutional.  *Id.* at 1163-64.

We agree with the district court that *Morgan* is distinguishable.  The officers in *Morgan* presented no evidence that their arrest, entry, or search of the defendant's home was precipitated by a reasonable belief that an urgent response was needed.  *Id.* at 1162-63.  The evidence instead established that the officers used coercive tactics to lure the defendant from his home because they worried that obtaining a warrant on the weekend would be difficult and they did not want to wait. *See id.* at 1161.  In contrast, as soon as Pitts arrived at Crabbs's home, he encountered circumstances that, considered together, caused him to make the split-second determination that he should follow Crabbs into his home.  It is true that Pitts controlled the timing of his encounter with Crabbs insofar as he decided to follow Crabbs to his home and initiate a stop.  Unlike the officers in *Morgan*, however, he did not control the timing of the events that occurred once he arrived at the home.

Ultimately, we find that viewing the evidence in the light most favorable to Pitts, and considering the totality of the circumstances "from the proper perspective of a reasonable officer," *Ryburn*, 565 U.S. at 477, a jury could conclude that exigent circumstances justified Pitts's warrantless entry into Crabbs's home.  To be sure, several of the factual circumstances surrounding Pitts's entry were in dispute, including whether Crabbs was "blading," whether he told Pitts that he had a gun, whether he was agitated and swearing at Pitts at the door, and whether Anne Crabbs came to the door during the exchange.  But "the factual determination whether exigent circumstances existed . . . is properly submitted to the jury providing, given the evidence on the matter, there is room for a difference of opinion." *Carlson v. Fewins*, 801 F.3d 668, 676 (6th Cir. 2015) (quoting *Jones v. Lewis*, 874 F.2d 1125, 1130 (6th Cir. 1989)).  Here, there was room for a

difference of opinion on the ultimate question of exigent circumstances. The jury considered all the evidence and testimony—including evidence that Crabbs had made threats to officers in the past, had been charged with manslaughter, had threatened to kill two neighbors, had a gun and was "blading," had ignored Pitts's commands, and was agitated—and determined it would cause a reasonable officer to believe that exigent circumstances existed. Although the jury *could have* come to a different conclusion, the evidence is not such that "reasonable minds could come to but one conclusion in favor of the moving party." *Balsley*, 691 F.3d at 757.

Accordingly, we AFFIRM the district court's judgment and denial of Plaintiffs' motion for judgment as a matter of law.