Choice L. CAUSEY and Henretta Denise Bradley, Plaintiffs,

v.

CITY OF BAY CITY, John May, Joseph E. Doyle, Eric Sporman, Ken Souser and Thomas Pletzke, Defendants.

No. 02–CV–10318 BC.

United States District Court, E.D. Michigan, Northern Division.

Jan. 6, 2005.

Victor J. Mastromarco, Jr., Russell C. Babcock, Cady, Mastromarco, Saginaw, MI, for Plaintiffs.

Ethan Vinson, Cummings, McClorey, Livonia, MI, for Defendants.

### *OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION TO STRIKE*

LAWSON, District Judge.

Choice L. Causey and Henretta Denise Bradley, the plaintiffs in this case, live

together in a home on South Sheridan Street in Bay City, Michigan. They have filed a complaint against the City of Bay City and several of its police officers alleging that their civil rights were violated when the police forcibly entered and searched their home without a warrant on New Years Eve of 2000. They also contend that on at least two other occasions, Bay City police officers unlawfully stopped and searched their vehicle, and that the defendants conspired to violate the plaintiffs' civil rights. The defendants have filed a motion for summary judgment contending that the plaintiffs have not made out a case sufficient to hold the municipality liable for constitutional violations; exigent circumstances justified the warrantless entry of the home; the traffic stops were constitutionally valid; the conspiracy count was not pleaded with the requisite specificity and it is barred by the intercorporate conspiracy doctrine; and the individual defendants are entitled to qualified immunity. The Court held a hearing in open court on October 18, 2004 and heard counsels' arguments, and the matter is now ready for decision. The Court finds that the plaintiffs have not brought forth sufficient facts to create a jury-submissable question concerning their complaints about any of the traffic stops, save one; the municipal defendant is entitled to summary judgment because the plaintiffs have not proved that they suffered damages as a result of an unconstitutional policy, custom or practice of the City; there is insufficient evidence in the record of a conspiracy; fact questions preclude summary judgment against most of the individual officers on the alleged Fourth Amendment violation concerning the warrantless search of the home; there is sufficient evidence of an equal protection violation to require a trial; and the officers are not entitled to qualified immunity. The motion for summary judgment, therefore, will be granted in part and denied in part.

## I.

### A. The December 31, 2000 search

The main focus of the plaintiffs' case is the warrantless entry and search of their home. The following facts have been extracted from the parties' depositions and submissions, and they are largely in dispute.

On December 31, 2000, defendants Joseph Doyle and Eric Sporman of the Bay City police department were dispatched to the plaintiffs' residence on South Sheridan Street in response to a complaint from a neighbor that gunshots had been fired in the vicinity of the plaintiffs' home. They arrived at approximately 7:30 p.m. and spoke with the neighbor, Lisa Stevens, who complained that her neighbor also fired gunshots to celebrate the previous Fourth of July holiday and on New Year's Eve the year before. Stevens told Sporman and Doyle that she thought the gunshots came from the plaintiffs' back yard, and that she had not seen anyone enter or leave the house after she called.

When they approached the plaintiffs' home, the officers observed dim lights coming from the residence and heard a television. Officer Sporman stated that officer Doyle knocked on the plaintiffs' front door "I don't know exactly how many times." Def.'s Mot. S.J. Ex. 1, Sporman dep. at 21. Sporman could not recall if they identified themselves or "if we said anything." *Id.* According to Sporman, the officers looked inside the residence and around the windows to see if they could make contact with the plaintiffs.

After speaking with Ms. Stevens, officers Doyle and Sporman walked around to the plaintiffs' backyard, the apparent origin of the gunshots. The plaintiffs testified that the yard was enclosed by an eight-foot privacy fence, and the officers broke the lock on the gate to effectuate

entry. Sporman stated that he observed an indentation in the snow; he dug deeper and scooped up a nine millimeter spent casing. Sporman handed Doyle the shell casing, and they continued looking around the area of the deck, where they discovered additional indentations in the snow; more digging turned up three more spent shells. Sporman stated that it was not snowing at the time and that he could not recall whether it had snowed that day. Plaintiff Causey, however, testified that it had snowed that day. Doyle stated that he saw no fresh footprints in the snow except those of a dog.

Sporman testified that after finding the shell casings, the officers continued "to attempt to make contact with somebody. I think at some point we asked Central Dispatch to call the residence." *Id.* at 31. According to Sporman, Doyle made radio contact with his shift supervisor, Sergeant Nancy Feinauer. Sergeant Feinauer attempted to telephone the plaintiffs at their residence, but the call was answered by an answering machine. At about this time, the central dispatcher informed the officers that a "911 hang-up call" had been placed from the residence at 6:42 p.m. that evening, and the police had made contact with someone at the residence who explained that the call came from a small child playing with the telephone. Plaintiff Causey testified that the 911 call was an innocent mistake. He said that Karli Peterson, Bradley's four-year-old daughter, recently had learned to make a 911 call at school, and "so as the evening went on, somewhere Karli got a hold of the telephone." Pl.'s Ans. to Mot. S.J. Ex. 2, Causey dep. at 64. Karli called 911, but a minute afterward Bradley called back to assure the police that there was no need to send officers to investigate. Doyle explained in his deposition that he was aware of this exchange.

Thereafter, Sporman went to see if "there were any more witness interviews to be done" and headed south on Sheridan Street. Sporman dep. at 55. Sporman stated that he spoke with another neighbor who claimed he had heard a single gunshot that came from behind his home, and then heard a series of five more gunshots from the same location, which he believed to be the plaintiffs' residence. After officers Doyle and Sporman related all the information to Sergeant Feinauer, she authorized a forceful entry of the plaintiffs' home, but instructed them to wait for additional officers to arrive before they made the attempt. According to Doyle, approximately fifteen to twenty minutes elapsed before those officers arrived.

At approximately 8:15 p.m., Sergeant Feinauer dispatched four more officers to the residence. They arrived sometime thereafter with a battering ram. Defendant officer Kenneth Souser testified in his deposition that after receiving Sergeant Feinhauer's authorization to enter plaintiffs' house, he used the ram to break down the front door. Def.'s Mot. S.J. Ex. 5, Souser dep. at 45. Before he used the ram, however, officer Doyle apparently "knocked on [the door] six times loudly, enough to wake the dead actually. And yelled six times 'This is the police, we're coming in, this is the police, we're coming in.'" Def.'s Mot. S.J. Ex. 3, Doyle dep. at 74. When Souser was about to hit the door a second time, he recalled hearing a voice inside "say something like 'Okay I'm coming.'" Souser Dep. at 45. According to Souser, it was too late and the door swung open. After breaking down the door, Souser entered the plaintiffs' home followed by officers Ducolon and Doyle. Causey was seated on the couch, and Souser testified that one of the other officers handcuffed Causey. Doyle, however, testified that Causey was walking toward the

door and officer Doyle placed Causey in handcuffs.

Souser testified that one of the officers brought Bradley into the living room. Once the plaintiffs were both in the living room, the officers "checked the house for people and secured the house." *Id.* at 55. Officer Souser estimated that it took about a couple of minutes to secure the house, after which the officers questioned Causey about the shots that had been fired and the location of a weapon. *Id.* at 58. The officers found no injured persons. Doyle testified that he asked Causey if he could search for the gun, and Causey refused. At that point, officer Doyle informed Causey that he was going to get a search warrant and he left the plaintiffs' house with Sporman to obtain a warrant. Officer Ducolon was left in charge in officer Doyle's absence.

The plaintiffs described the incident in different terms. Plaintiff Causey testified in his deposition that around 7:30 p.m. police officers, without identifying themselves, "pounded" on his front door. Causey dep. at 64. Causey got up, peeked out the window, and "seen it was the police." *Ibid.* He then "went back and sat back down and finished doing whatever it was I was doing at that time." *Ibid.* Causey did not feel the need to open the door, and "thought that they were just out maybe canvassing the neighborhood for whatever reason of [sic] responding to the 911 call." *Id.* at 65. According to Causey, at the time police knocked, "me and Denise [Bradley] were in the bed. We finished up and that was that." *Ibid.* Bradley testified in her deposition that she and Causey heard "the knock on the door or window." Pl.'s Ans. to Mot. S.J. Ex. 1, Bradley dep. at 25. She and Causey were both in the bedroom and did not respond to the officers because "we were in the bed. We were actually—we were having sex, so we

ignored the knock." *Id.* The police eventually went away.

According to Causey, at some point during the night, the "police came back and they were banging on the door again." Causey dep. at 65. Causey testified that instead of opening the door, he went to the bedroom window that overlooks the front porch. Causey said that this time police identified themselves and told them they were there to check on the well-being of the occupants. The officers apparently demanded entry and informed Causey and Bradley that they had no search warrant. Causey testified that "they were very eager to get in for some reason." *Id.* at 66. However, Causey said that he told the police that they were "fine," and showed them that "there were no black eyes, no signs of fighting, none of that physical—none of that." *Ibid.* Causey testified that he and Bradley then retreated from the window and stopped communicating with the officers. *Ibid.* After they backed away from the window, the phone rang a few times, but Causey testified that they let the machine pickup. *Id.* at 67. Shortly after the phone rang, Causey remembered "all I hear is the front door being kicked in or pushed in, however, they got in, the front door open." *Ibid.*

Causey testified that when police rammed the door open, he was seated on the couch in his pajamas and immediately threw his hands up. Causey dep. at 69. Officers entered the home; one officer, according to Causey, confronted him: "I'm told I am under arrest, Nigger. I'm putting handcuffs on." *Id.* at 70. Causey testified that officers asked him where the "guns were at." Causey testified that he was handcuffed behind his back and taken to the kitchen. *Id.* at 72. Causey said that officer Doyle informed him that he had just begun his shift and that he had all night; Causey might as well just tell him

where the guns were. The officers also told him he was going to jail and brought him back into the living room. Causey testified that they then brought Bradley into the kitchen, and when she came out of the kitchen the officers did "a small search" opening the blinds, "and—and questioning" *Id.* at 73.

Causey testified that the officers then proceeded to search the house. He said the officers took turns watching Bradley and him, and also helping themselves to juice or Kool–Aid in the refrigerator. He said that the officers damaged his property while conducting the search, and the plaintiffs have attached photographs that they claim represent the condition of the house after the police left. Causey also claims that the police made racial jokes "as far as putting tar all over my body and putting feathers on it. They were making all sorts of derogatory comments." Causey dep. at 77. Bradley also testified that the search was conducted before Doyle returned with the search warrant at 12:17 a.m. She stated that the officers had disassembled the housing on the fifty-inch television set but had not yet disabled it, and they watched the "ball drop" to signify the new year before Doyle returned.

Officer Doyle stated in his deposition that he was unsure how long he was gone to obtain the search warrant, but it could have taken a long time because it was New Year's Eve. Doyle dep. at 98. After looking over his notes Doyle explained that the search warrant was issued at 11:50 p.m. on December 31, 2000 authorizing a search for that day. Officer Doyle also explained he had a twenty-minute drive back to the plaintiffs' residence and agreed he returned there after midnight with the warrant. He arrived at the plaintiffs' residence to find that officers had already searched the house. *Id.* at 104. Upon arrival, Doyle handed the search warrant to Causey who was still in handcuffs.

Doyle himself then proceeded to search the house for a period of thirty minute or more. The search produced an additional shell casing, but no gun. *Id.* at 126. The officers then "started to finalize things" and left. *Id.* at 128. The plaintiffs were not taken into custody, and no criminal charges were filed.

### B. The traffic stops

The facts concerning the traffic stops also are disputed by the parties. During oral argument at the motion hearing, counsel for both parties expressed confusion as to the number and exact dates of the traffic stops. Counsel for the defendants stated that he was not aware whether two or three traffic stops had occurred and whether officer May had participated in any of those stops. Plaintiffs' counsel, however, apparently believed that two traffic stops were at issue in the case—one occurring in June of 2000 before the warrantless entry of the plaintiffs' home and one occurring sometime thereafter in March or April of 2001, although the statement of facts in the plaintiffs' response brief contains references to additional incidents.

The record evidence contained in the parties' submissions suggests that there may have been as many as six traffic stops occurring between June 10, 2000 and August 25, 2003, although not all of them are the subjects of the plaintiffs' lawsuit. However, according to the plaintiffs, Causey was subjected to a series of harassing and racially motivated traffic stops. In his deposition, Causey stated that he was pulled over on June 10, 2000, a traffic stop that a magistrate judge later concluded was without merit. Causey dep. at 120–21. Causey testified:

Q: Alright. And this is reflating to—I saw a June date on here. Yes. Offence date of June 10, 2000 for disobeying a traffic signal?

A: Disobeying a traffic sign.

Q: What's this about?

A: Just—just another form of harassment here. I—I—I was driving—coming into Bay City. I just left a cousin's house. And to the best of my knowledge, as soon as I got into town, a police officer started following me. I—I pulled over to the side of the road and let the police officer go ahead.

The police officer went up a few blocks. I turned down the side street. I was close to home. And the police officer then, in return, same one, came back and started proceeding to follow me. And before it—he—he—after he followed me for a probably a good twenty minutes, he—he issued me a ticket, and he say I ran a stop sign. It's 3:00 in the morning, 2:00 in the morning. I ran a stop sign, and he's fifteen blocks behind me.

Q: Okay, And it appears—did you go to court on this?

A: Yes, I did.

Q: What happened?

A: The judge threw the ticket out.

*Ibid.* Bay City police records from that time period indicate that Causey was issued a citation for disregarding a stop sign on June 10, 2000 at approximately 12:20 a.m. Def.'s Mot. Summ. J. Ex 9, State of Mich. Uniform Law Citation.

Causey testified he again was stopped by police on August 26, 2000. Causey dep. at 44. During this stop, Causey stated that officer David May harassed him and failed to disclose the basis for pulling Causey over:

Q: Okay. Now, according to this report that you filed you say that . . . Officer May and myself made eye-to-eye contact. He then immediately did a u-turn on or about Columbus and Madison Avenue close to Denny's Party Store, then proceeded to catch up with

me and put his lights on, no siren, just lights to make the car that was directly behind me—can you—I can't make that out. Can you help me?

. . . . .

A: —directly behind me to move that car so he can tailgate me. That is not what it says, but—

Q: That's what it should say?

A: Yes. I—

Q: All right. Yes, it appears that it may—part may be cut off here. Okay.

A: Yes mine is, too.

He moved—he cut the lights on the car to move the car directly behind me so that he can tailgate me for approximately three to four miles. Then, for no apparent reason, he pulled me over.

*Id.* at 44–45. Causey further testified that officer May, over a period of twenty minutes, verbally harassed him, saying that Causey looked like "Nigger Dre, Nigger Choy, some nigger they're looking for." *Id.* at 50.

Causey related that he had another run in with May on September 2, 2000 in which May tailgated Causey with a patrol car. *Id.* at 53. May's behavior on these occasions, Causey stated, prompted him to file a civilian complaint with the Bay City Police Department. After he filed the complaint, however, Causey observed individuals in unmarked vehicles outside the plaintiffs' home apparently conducting photographic surveillance. At one point, Causey followed an unmarked vehicle and claims it returned to the Bay City Police Department.

After the search of the plaintiffs' home, Causey stated that he had continuing problems with the police department. On March 21, 2001, officer Kenneth Souser, who participated in the search of the plain-

tiffs' residence, pulled Causey over. Souser dep. at 97–98. Souser stated in his deposition that he pulled Causey over because he suspected Causey was harassing a Bay City resident who had called in a complaint. *Id.* at 93. Souser, however, admitted he was not thinking of any specific criminal offense. *Ibid.* Souser stated that at the time Souser pulled Causey over, he was unaware that Causey had violated any traffic ordinances. *Ibid.*

In response to being stopped, Causey stated that he attempted to file a complaint with the City. Causey gave a handwritten, signed document to a Sergeant Charter. According to Causey, Sergeant Charter took the document and promised to return with a copy for Causey. However, Causey explained that Sergeant Charter returned and informed Causey that a department policy change had occurred, and that he could not give Causey a copy.

Both Causey and Bradley testified in their depositions that they were also pulled over by officer May sometime after the search of their home. Bradley dep. at 17; Causey dep. at 102. According to Causey, the incident occurred sometime in March or April of 2001 when it was "raining real bad." *Id.* at 99. Bradley stated that upon pulling the vehicle over, May told Causey to "get his black ass out of the car." Bradley dep. at 17. Causey stated that May had followed him for about a mile, "pulled me over, but the end result was my keys were locked in the vehicle and me and Denise on the side of the road in a rain storm." Causey dep. at 102. Causey further stated that May did a light search of the car, but purposely took the keys out of the ignition, placed the keys on the seat, and locked the doors.

According to police records attached to the defendants' motion, on August 25, 2003, at approximately 10:10 am, Causey was pulled over a final time and issued a citation by Bay City police. Def.'s Mot.

Summ. J. Ex. 9, Mich. Uniform Law Citation. He was cited for driving with an expired plate, tinted windows in violation of municipal code, and an expired proof of insurance.

## C. Proceedings

On December 24, 2002, the plaintiffs filed a complaint, later amended on January 9, 2003, against the City of Bay City, and police officers John May, Joseph E. Doyle, Eric Sporman, Ken Souser, and Thomas Pletzke, based on 42 U.S.C. § 1983 in which it was alleged that their rights under the Fourth Amendment and the Michigan constitution were violated (count 1); the Equal Protection Clause of the Fourteenth Amendment contending that the Bay City police officers acted against the plaintiffs on account of their race (count 2); Section 1983 against Bay City for failure to properly train its police officers (also alleged in count 2); and conspiracy to violate the plaintiffs' civil rights in violation of 42 U.S.C. § 1985. On September 12, 2003, the Court entered an order suspending the proceedings for a period of six months because one of the individual defendants, an indispensable party, was called to active military duty. *See* 50 U.S.C.App. § 510, *et seq.* On April 13, 2004, the parties informed the Court that they wished to proceed with the case, and the Court reopened the matter. Thereafter, the defendants moved for summary judgment as to all counts of the amended complaint.

## II.

A motion for summary judgment under Federal Rule of Civil Procedure 56 presumes the absence of a genuine issue of material fact for trial. The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to re-

quire submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (internal quotes omitted).

A fact is "material" if its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir.2001). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir.2000). An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics & Space Admin.*, 14 F.3d 1143, 1148 (6th Cir.1994) (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505). Irrelevant or unnecessary factual disputes do not create genuine issues of material fact. *St. Francis Health Care Centre v. Shalala*, 205 F.3d 937, 943 (6th Cir.2000). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Thus a factual dispute that "is merely colorable or is not significantly probative" will not defeat a motion for summary judgment which is properly supported. *Kraft v. United States*, 991 F.2d 292, 296 (6th Cir. 1993); *see also Int'l Union, United Auto., Aerospace and Agric. Implement Workers of Am. v. BVR Liquidating, Inc.*, 190 F.3d 768, 772 (6th Cir.1999).

The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record which demonstrate the absence of a genuine dispute over material facts. *Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir.2002). The party opposing the motion then may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir.1989). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. If the nonmoving party, after sufficient opportunity for discovery, is unable to meet his or her burden of proof, summary judgment is clearly proper. *Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. 2548.

The party who bears the burden of proof must present a jury question as to each element of the claim. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir.2000). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir.1991).

### A. The municipal defendant

Defendant Bay City contends that the plaintiff has not made a case against it under Section 1983 because the City cannot be vicariously responsible as a matter of law for the actions of its police officers, there is no evidence that the City itself committed a constitutional violation, the conspiracy claim was not pleaded with the requisite specificity, and the intra-corporate conspiracy doctrine bars the claim under Section 1985. The plaintiff counters

that the City is liable under Section 1983 for the failure to adequately train its officers.

### 1. The Section 1983 claim

■ To establish a claim under 42 U.S.C. § 1983, the plaintiff must satisfy two elements: (1) that there was a deprivation of a right secured by the Constitution and (2) that the deprivation was caused by a person acting under of color of state law. *Wittstock v. Mark A. Van Sile, Inc.* 330 F.3d 899, 902 (6th Cir.2003). Municipalities are considered "persons" within the meaning of Section 1983; however, a city "cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondent superior* theory." *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Rather, municipal liability will be found only when the alleged unconstitutional act "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by the body's officers." *Id.* at 689, 98 S.Ct. 2018. A municipality also "may be sued for constitutional deprivations visited pursuant to governmental custom even though such custom has not received formal approval through the body's official decision making channels." *Berry v. City of Detroit*, 25 F.3d 1342, 1345 (6th Cir.1994).

■ As the Supreme Court recognized in *City of Canton, Ohio v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), a city can be held liable under Section 1983 for failure to train its employees. However, in order to prevail on a Section 1983 "failure to train" claim, the plaintiff must show that the "training program is inadequate to the tasks that officers must perform; that the inadequacy is the result of the city's deliberate indifference; and that the inadequacy is closely related to or actually caused the plaintiff's injury." *Hill v. McIntyre*, 884 F.2d 271,

275 (6th Cir.1989). A municipality can be held liable for inadequate police training under Section 1983 "only where [the] failure to train amounts to deliberate indifference to rights of persons with whom police come into contact." *City of Canton*, 489 U.S. at 388, 109 S.Ct. 1197. The mere fact that a few officers may be inadequately trained is not sufficient to demonstrate liability, as the shortcomings could be caused by officer inattention or poor administration. *Id.* at 391, 109 S.Ct. 1197. Allegations that the officers in question could have been better trained are also insufficient. *Id.* Rather, the "failure to train [must] reflect[ ] a deliberate or conscious choice by a municipality." *Id.* at 389, 109 S.Ct. 1197.

In *City of Canton*, the Supreme Court recognized two fact patterns in which a citizen could state a claim for failure to train. First, the nature of the officers' duties could be such that "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need" in not providing training. *Id.* at 390, 109 S.Ct. 1197. The Court isolated the need to apprehend fleeing felons and the possession of firearms by officers as indicating to a "moral certainty" that proper training would be required. *Id.* n. 10, 109 S.Ct. 1197. Second, the police may have so often violated constitutional rights that the need for further training must have been "plainly obvious to the city policymakers, who, nevertheless, are 'deliberately indifferent' to the need." *Id; see also id.* at 397, 109 S.Ct. 1197 (O'Connor, J., concurring) (finding that such behavior constitutes "tacit authorization" of the officers' conduct).

The Sixth Circuit applied this standard in *Walker v. Norris*, 917 F.2d 1449 (6th

Cir.1990), in which an inmate's estate brought suit against prison guards and their supervisors for failure to prevent his stabbing death. *Id.* at 1452. There, prison guards refused to open a prison door to assist an inmate who was being stabbed to death on the other side. *Id.* The plaintiff alleged that the guards' supervisors had failed to give them proper training in opening the prison doors. *Id.* at 1456. Rejecting the plaintiff's claim, the Court found that corrections officers received three weeks of training upon hiring, and forty hours per year of refresher training after that. In effect, the plaintiff alleged only that the guards could have been better trained, which is insufficient under *City of Canton. Id.* at 1456. There was no other evidence of deliberate indifference toward training in the record, and the district court's decision to dismiss plaintiff's claim was affirmed. *Id.*

The issue of poor training came before the Sixth Circuit again in *Berry v. City of Detroit,* 25 F.3d 1342 (6th Cir.1994). There, the plaintiff estate brought suit for the fatal shooting of its decedent by a police officer, alleging two failure-to-train theories: inadequate training *per se* and failure to discipline officers who had previously committed constitutional violations. *Id.* at 1344. The Sixth Circuit gave plaintiff's first theory short shrift. Undisputed testimony established that candidates at the Detroit Police Academy underwent over 600 hours of training, including sixty hours of firearms training. *Id.* at 1437. The Academy's training on use of fatal force exceeded state minimum requirements, and candidates were required to score 100 percent on the written fatal force policy examination. *Id.* The officers also had annual refresher training concerning the use of deadly force, received frequent bulletins on the issue, and had to requalify themselves each year in firearms usage. *Id.* The officer in question had completed all of these programs. The plaintiff's ex-

pert himself admitted that he had no problem with the department's training programs. *Id.* As such, the plaintiff's claim that the City of Detroit's policymakers were deliberately indifferent to the need for training was rejected.

The plaintiff's arguments surrounding the department's alleged "failure to discipline" wayward officers did not fare much better. The Court first noted that "deliberate indifference" in this context exists only upon "a showing of a history of widespread abuse that has been ignored by the City." *Id.* at 1354 (citing *City of Canton,* 489 U.S. at 397, 109 S.Ct. 1197). The Court rejected the findings of the plaintiff's expert witness, holding that the expert, at best, demonstrated "that discipline was not as frequent or as severe as *he* would have liked," which does not demonstrate *constitutional* infirmity. *Id.* The Court distinguished the situation in *Berry* from that in several other cases. First, the Court cited *Spell v. McDaniel,* 824 F.2d 1380 (4th Cir.1987). In that case the facts were as follows: (1) seven lay citizens testified that they had filed brutality complaints that were not investigated; (2) eight present or former officers of the city police department testified as to a "code of silence" and of training in improper means of subduing suspects; (3) an assistant district attorney had investigated and prosecuted officers for excessive force, with no noticeable effect; (4) the department's legal advisor left because of concerns over police brutality; (5) internal records showed that complaints filed were completely disregarded. *Id.* at 1355 (citing *Spell,* 824 F.2d at 1391–95). Second, the Court looked to *Fiacco v. City of Rensselaer,* 783 F.2d 319 (2d Cir.1986). In *Fiacco,* the plaintiffs demonstrated that although the municipality in question had a policy on use of force, the police chief had never seen it. *Id.* at 329. The plaintiff also demonstrated eight citizen complaints

about police brutality that not only were not investigated, but were not even noted in the officers' files. *Id.* at 330. Finally, the Court looked to the Tenth Circuit's decision in *Zuchel v. The City and County of Denver*, 997 F.2d 730 (10th Cir.1993). There, the plaintiffs successfully alleged deliberate indifference to the officers' inadequate training in the use of deadly force. The plaintiff's expert demonstrated that the department's training in the use of fatal force was completely deficient. *Id.* at 740. The plaintiff also proffered a letter from a county district attorney, which referenced six recent, fatal shootings that he felt were the result of poor training. *Id.* The district attorney recommended a series of training procedures to alleviate the problems, but his recommendations were ignored. *Id.*

In *Berry*, however, the plaintiff could provide nothing that met the standards established by these cases. The evidence showed that the City of Detroit had procedures in place to review violations of its fatal force policy, and that over a five-year period, 38 officers were retrained and 52 disciplined as a result of internal investigations. *Berry*, 25 F.3d at 1355. Even if the plaintiff was correct in asserting that the internal investigations were grossly mismanaged, there was no evidence of deliberate indifference toward situations involving fatal shootings. *Id.* Accordingly, plaintiff's claims for inadequate discipline and training of officers was dismissed.

■ In this case, the plaintiffs allege that the City inadequately train is police officers on the proper entry into and execution of a search of personal residences. However, in his deposition, officer Sporman testified that he received training on searching residences in the field. Sporman dep. at 16. He explained that the field training program lasted somewhere between twelve and fifteen weeks. *Id.* Officer Doyle testified that he received training on search and seizure. Doyle dep. at 35–36. Doyle estimated that if a lawyer assisted in the training, Doyle would spend four to five hours in a given year on search and seizure training. *Id* at 35. If a lawyer was not involved in training, he spent around two or three hours annually. *Id.* Each year, officer Doyle recalled, there was also practical training on searching residences. *Id* at 36. Officer Souser also stated in his deposition that he received on-the-job training on search and seizure in addition to the field training period, but was unable to estimate the amount of time spent specifically on that training. Souser dep. at 17–18. Officer Souser also recalled receiving literature outlining the law with respect to search and seizure. *Id.* The defendants also submitted training records in support of their motion, but these records are the subject of a motion to strike because of the failure to disclose them in accordance with the Case Management and Scheduling Order. Therefore, the Court has not considered them here, although they are of little consequence because the deposition testimony furnishes evidence of the City's training practices.

Perhaps Bay City could have spent more resources preparing its officers to meet the day-to-day demands of police work in the city. However, the mere fact that these officers could have been better trained, or more prepared for this particular incident, however, does not establish deliberate indifference toward training by Bay City. As the Supreme Court held in *City of Canton,*

Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond

properly to the usual and recurring situations with which they must deal. *City of Canton,* 489 U.S. at 391, 109 S.Ct. 1197. Even if the officers made a mistake in this instance, that too is insufficient to hold the city liable. *See id.* The plaintiffs present no expert testimony indicating that the Bay City's failure to provide a particular aspect of entry-and-search training is a serious oversight. *See Russo v. City of Cincinnati,* 953 F.2d 1036, 1047 (6th Cir.1992) (noting the importance of expert testimony in cases challenging municipal training). Instead, plaintiff appears to reason that officers somehow must be trained for every incident they could conceivably encounter in the field. This proposition was convincingly rejected in *Fromuth v. Metro. Gov't of Nashville,* 158 F.Supp.2d 787 (M.D.Tenn.2001). In that case, the plaintiff attempted to argue that a police department's training program was constitutionally deficient for failure to address the specific use of shotgun butts as a means of force. Finding that a general policy on use of force was more than adequate, the court held that

> to require the city to catalogue every potential situation that might arise in the force context and then document it, draft a written policy on it, and train its officers on it would be both unrealistic and unproductive in achieving the goal of creating an easy to follow directive that educates officers as well as protects a suspect's constitutional rights.

*Id.* at 794.

Nor have the plaintiffs come forward with sufficient evidence of failure to discipline or respond to citizen complaints. The sole basis for this aspect of the plaintiffs' claim against the City is Causey's testimony that he filled out two civil complaints that his rights were violated when police searched his home and stopped his vehicle, and that he received no follow-up from the City. However, this scant evidence does not demonstrate "a consistent pattern of ignoring constitutional violations." *Berry,* 25 F.3d at 1354. The Court has been unable to find other evidence that suggests that Bay City ignored the complaints of citizens against police officers or that there was a pattern of "widespread abuse" or other neglect that revealed the City's deliberate indifference to constitutional violations. Of course, it is not the duty of the Court to scour the record on a party's behalf, but rather it is a party's obligation to direct the Court to evidence in the record establishing genuine issues of material fact. *See In re Morris,* 260 F.3d 654, 665 (6th Cir.2001). The plaintiffs have not brought forth such evidence, and Bay City is entitled to summary judgment on the Section 1983 claim.

### 2. *The conspiracy claim under Section 1985*

■ As previously mentioned, the defendants challenge that plaintiffs' conspiracy claim on the grounds that the plaintiffs have not stated sufficient facts to make out a claim under the statute, and the intra-corporate conspiracy doctrine bars municipal liability where the alleged co-conspirators are city employees. *See Hull v. Cuyahoga Valley Joint Vocational School Dist. Bd. Of Ed.,* 926 F.2d 505, 509 (6th Cir.1991)(holding that the essence of the intra-corporate conspiracy doctrine is that a corporation cannot conspire with itself just as an individual cannot conspire with himself). The Court finds it unnecessary to reach the second of these arguments because it is convinced that the defendants must prevail on the first.

■ Section 1985(3) of Title 42 of the United States Code states:

> If two or more persons in any State or Territory conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws ... in any

case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

To state a valid cause of action under Section 1985, the conspiracy claims must be pled with specificity; mere vague and conclusory allegations unsupported by material facts are insufficient. *Gallegos v. City and County of Denver,* 984 F.2d 358 (10th Cir.1993); *Kadlec v. Illinois Bell Tel. Co.,* 407 F.2d 624 (7th Cir.1969). The defendants argue that the plaintiffs state the mere conclusion of a conspiracy and do not support it with factual pleadings.

The Sixth Circuit has not addressed the requisite degree of specificity necessary to plead a claim under § 1985. However, in *Kadlec,* the Seventh Circuit held that it was insufficient merely to allege that a telephone company had engaged in a conspiracy simply by stating so in the complaint. 407 F.2d at 627. According to *Ashiegbu v. Purviance,* 76 F.Supp.2d 824, 830 (S.D.Ohio 1998), "under 1985, a plaintiff must plead his civil rights conspiracy charge with factual specificity; mere conclusory allegations will not survive a motion to dismiss." Similarly, in *Smith v. City of New York,* 290 F.Supp.2d 317 (E.D.N.Y.2003) a plaintiff's naked assertion that she was harassed by police detectives was deemed insufficient because she failed to provide any fact from which an agreement could be inferred or any indication of the nature of the municipal custom or policy. *Id.* at 320. Finally, in *Nielson v. Legacy Health Systems,* 230 F.Supp.2d 1206 (D.Or.2001), the plaintiff failed to plead his complaint with specificity because he did not provide specific factual allegations with respect to each of the defendants acts which led him to believe there was a conspiracy. *Id.* at 1210.

■ In this case, the Court finds the plaintiffs' attempt at pleading a conspiracy claim under Section 1985 woefully inadequate. The amended complaint does not plead facts to establish the elements of the claim. Count III of the plaintiffs' amended complaint reads:

38. That at all times relevant herein, Defendants conspired to deprive Plaintiffs of their Constitutional rights including the fourth and fourteenth amendments either directly or indirectly as a result of Plaintiffs race.

39. That the above-mentioned acts were done in furtherance of a conspiracy.

40. That the conspiracy has resulted in injury to plaintiffs, their property, and has resulted in a deprivation of their fourth and fourteenth amendment rights as citizens of the United States.

41. That the conspiracy was motivated by race based amicus.

As the defendants note, no facts have been alleged here that support a meeting of the minds, the specific acts that constitute the requisite overt act, any existence of an agreement between several different officers, and how specifically the plaintiffs have been deprived of their rights as a result of the conspiracy. The Court finds, therefore, that Count 3 of the plaintiffs' amended complaint fails on its face and ought to be dismissed.

### B. Liability of individual officers

#### 1. Officers May and Pletzke

■ As an initial matter, defendants move for summary judgment on behalf of officers May and Pletzke because they did

not participate in the search of plaintiffs' residence or the traffic stops. There is no evidence in the parties' submission that officer May participated in the search. The plaintiffs also have not pointed to any direct evidence of May's participation. Deposition testimony indicates that officer Pletzke was merely present at the scene while a search was being conducted. Doyle dep. at 120–26. In addition plaintiffs point to no evidence that he otherwise was involved in any way with the entry or search of the plaintiffs' home. "The mere presence of an officer at the scene of a search without a showing of direct responsibility for the action, would not subject an officer to liability." *Ghandi*, 747 F.2d at 352. The Court, therefore, will grant the motion for summary judgment as to defendants May and Pletzke with respect to the events of December 31, 2000 and January 1, 2001.

### 2. *Qualified immunity*

The defendants contend that there was no violation of the plaintiffs' constitutional rights because exigent circumstances justified the warrantless entry into the plaintiffs' home, and even if the defendants were mistaken about their authority to enter, they are immune from suit under the doctrine of qualified immunity. The issues raised by these two arguments merge into the multi-step analysis prescribed for claims of qualified immunity.

Qualified immunity is an affirmative defense that protects government actors performing discretionary functions from liability for civil damages, provided their conduct does "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The purpose of this defense is to strike a balance that "accommodates the tension between permitting litigants to recover damages, which is often the only realistic avenue for vindication of constitutional guarantees, and the social costs of such suits, including the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 900 (6th Cir.2004) (internal quotes and citation omitted).

The Supreme Court has held that a claim of qualified immunity must be examined in two stages, *see Saucier v. Katz*, 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001): "[f]irst, a court must consider whether the facts, viewed in the light most favorable to the plaintiff, 'show the officer's conduct violated a constitutional right,' " and then "the court must then decide 'whether the right was clearly established.' " *Solomon v. Auburn Hills Police Dept.*, 389 F.3d 167, 172 (6th Cir.2004) (quoting *Saucier*, 533 U.S. at 201–02, 121 S.Ct. 2151). The Sixth Circuit has expanded that inquiry into a three-step sequential analysis when the qualified immunity defense is raised in a summary judgment motion brought after some discovery has been conducted, as here. "The first inquiry is whether the plaintiff has shown a violation of a constitutionally protected right; the second inquiry is whether that right was clearly established at the time such that a reasonable official would have understood that his behavior violated that right; and the third inquiry is 'whether the plaintiff has alleged sufficient facts, and supported the allegations by sufficient evidence, to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established rights.' " *Tucker v. City of Richmond*, 388 F.3d 216, 220 (6th Cir.2004) (quoting *Higgason v. Stephens*, 288 F.3d 868, 876 (6th Cir.2002); *Champion*, 380 F.3d at 901) (citing *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003)).

Once the defense is raised, the plaintiff has the burden of demonstrating a violation of a constitutional right and showing that the right was clearly established. *Barrett v. Steubenville City Schools*, 388 F.3d 967, 970 (6th Cir.2004). Ordinarily, these questions can be answered by the court as a matter of law. *See Dickerson v. McClellan*, 101 F.3d 1151, 1157 (6th Cir. 1996). However, when assessing whether the public official's conduct was objectively reasonable, "the legal question of qualified immunity turns upon which version of the facts one accepts, [and] the jury, not the judge, must determine liability." *Champion*, 380 F.3d at 900 (quoting *Pouillon v. City of Owosso*, 206 F.3d 711, 715 (6th Cir.2000)) (quotation and ellipses omitted).

■ With respect to the first inquiry in the analysis, the plaintiffs contend that the individual police officers violated their right to be free of unreasonable searches and seizures guaranteed by the Fourth Amendment when, on New Year's Eve 2000, the police forcibly entered their property without a warrant, detained them, and searched their home. The Fourth Amendment states that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." In *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), the Supreme Court reasserted that the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Id.* at 585, 100 S.Ct. 1371. That is "[b]ecause 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion' stands '[a]t the very core of the Fourth Amendment.'" *Groh v. Ramirez*, 540 U.S. 551, 559, 124 S.Ct. 1284, 1290, 157 L.Ed.2d 1068 (2004) (quoting *Kyllo v. United States*, 533 U.S. 27, 31, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001)). Accordingly, to "minimize[ ] the danger of needless intrusions" into the "sanctity of the home," *Payton*, 445 U.S. at 586, 601, 100 S.Ct. 1371, the Fourth Amendment requires a warrant issued by a judicial officer—a "neutral and detached magistrate." *Johnson v. United States*, 333 U.S. 10, 14, 68 S.Ct. 367, 92 L.Ed. 436 (1948) (observing that "[t]he point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime"). The Supreme Court has consistently held that only "reasonable" searches are allowed by the Fourth Amendment, and that searches without a warrant are "*per se* unreasonable" except in a few well-defined and carefully circumscribed instances. *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). In the case of a person's home, warrantless entries and searches are "presumptively unreasonable." *Payton*, 445 U.S. at 586, 100 S.Ct. 1371.

There are a few well-defined and carefully circumscribed exceptions to the warrant requirement. *See Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). For instance, exigent circumstances may excuse the failure to procure a search warrant, but the government bears a "heavy burden" to demonstrate the exigency when attempting to overcome the illegality of a presumptively unreasonable search. *Welsh v. Wisconsin*, 466 U.S. 740, 750, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984). "Exigent circumstances are situations where real immediate and serious consequences will certainly occur if a police officer postpones action to obtain a warrant." *United States v. Williams*, 342 F.3d 430, 436 (6th Cir.2003).

The Sixth Circuit has explained that exigent circumstances can arise from "(1) hot pursuit of a fleeing felon; (2) imminent destruction of evidence; (3) the need to prevent a suspect's escape; and (4) a risk of danger to the police or others." *United States v. Johnson,* 22 F.3d 674, 680 (6th Cir.1994) (internal citations omitted); *see also Minnesota v. Olson,* 495 U.S. 91, 100, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990). The determination of exigent circumstances is "normally a question for the jury." *Ewolski v. City of Brunswick,* 287 F.3d 492, 501 (6th Cir.2002).

 In this case, the defendants point to the fourth rationale and claim that they were justified in entering the plaintiffs' home without a warrant to search for individuals who might be in need of assistance. As a general proposition, the defendants are correct as to the law. In *Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), the Supreme Court stated that the police have a "right" to respond to "emergency situations," and that the "Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid." *Id.* at 392, 98 S.Ct. 2408. However, the police must do more than demonstrate "the mere possibility" that an exigency exists. *United States v. Radka,* 904 F.2d 357, 362 (6th Cir.1990); *United States v. Jones,* 641 F.2d 425, 428–29 (6th Cir.1981). The test is an objective one: the police officer must be able to point to "specific and articulable facts" at "the moment of the warrantless entry" that would lead a reasonable, experienced, law enforcement officer to believe that someone inside the dwelling required immediate assistance. *See United States v. Morgan,* 743 F.2d 1158, 1162, 1163 (6th Cir.1984).

 The facts in this case suggest the following information was available to the defendant police officers during the evening of December 31, 2000:(1) the police received a phone call from a neighbor reporting gun shots originating from the vicinity of the plaintiffs's residence; (2) when Sporman and Doyle arrived at the plaintiffs' home, all the lights were dimmed and a television could be heard; (3) at some point a dispatcher received a 911 hangup call from the plaintiffs' home, but Doyle was aware that Bradley had called back to inform dispatch that a young child had made the call accidently; (4) the officers knocked on the door but no one answered; (5) a neighbor confirmed multiple gunshots coming from the plaintiffs' backyard; (6) Sporman and Doyle entered the plaintiffs' backyard and dug into the snow to find spent shell casings; (7) they then left the backyard, Doyle called his supervisor to report what he had found, and Sporman proceeded to question additional witnesses in the neighborhood; (8) the shift supervisor instructed Doyle to wait for backup before forcibly entering the home; (9) fifteen to twenty minutes elapsed before backup arrived; (10) officers knocked loudly on the plaintiffs' door, and when plaintiffs failed to respond in time, Souser broke down the door with a ram.

The discovery of the shell casings is problematical under Fourth Amendment law. The Sixth Circuit has recognized that a fenced-in backyard generally receives the same Fourth Amendment protection afforded a residence because "[t]he backyard and area immediately surrounding the home are really extensions of the dwelling itself[;] ... people have both actual and reasonable expectations that many of the private experiences of home life often occur outside the home." *United States v. Jenkins,* 124 F.3d 768, 772–74 (1997). Items in open view from "a lawful vantage point" are not protected from discovery. *Id.* at 774. But the officers make no claim that they viewed anything in the backyard from the street. In fact, Doyle

stated in his deposition the "saw a little fenced in area. I saw there was a doorway, tested it, noticed their was a little hinge lock, undid the hinge lock, opened the door, and the two of us went inside." Doyle dep. at 52. The defendants make no argument that exigencies existed at that point in the evening, especially in light of the information that the plaintiffs apparently had "celebrated" holidays in the past by firing weapons. There was no reasonable basis to conclude that someone in the house needed aid, and therefore the entry into the back yard without a warrant itself constituted a Fourth Amendment violation.

Even as more information came to light, exigent circumstances did not emerge. The Sixth Circuit has held that there are no exigent circumstances justifying a warrantless search if police have significant time to assess the situation prior to entry. *Morgan,* 743 F.2d at 1161. Nonetheless, the officers on the scene continued to investigate, interview witnesses, and gather evidence. No new information came to light during that time—time that could have been used to obtain a search warrant. In fact, the process of clearing information through Sergeant Feinauer mimicked the process one might have employed to obtain a warrant from a magistrate, demonstrating that sufficient time was available to comply with constitutional law. Moreover, the defendants have not identified "specific and articulable facts" that led them to believe there was someone in the house that needed *immediate* aid. *Compare Thacker v. City of Columbus,* 328 F.3d 244, 253 (6th Cir.2003) (finding exigent circumstances when police, responding to a 911 call to assist a person who had been "cut," were confronted by a man without a shirt answering the door and bleeding from a cut on his hand that obviously required stitches, viewed a broken beer bottle in the kitchen, and could not ascertain the location of the caller); *and Ewolski,* 287 F.3d at 501 (warrantless entry

approved where officers knew plaintiff's father was mentally ill; he was volatile, dangerous, and had not been taking his prescription medicine; he had taken to brandishing a shotgun in front of home healthcare workers; he informed plaintiff's brother that the guns were loaded and ready; officers observed him behaving erratically immediately prior to their decision to enter when he asserted the Fifth Amendment when asked about his wife and started singing the *Star Spangled Banner;* and they had actual knowledge that the father's wife and son were inside). In this case, the defendants' twenty-minute delay waiting for other officers to arrive before searching for a person in distress suggests otherwise.

When a violation of a plaintiff's constitutional right has been established, the court next must determine whether that right was clearly established. The critical inquiry is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted." *Solomon,* 389 F.3d at 173 (quoting *Saucier,* 533 U.S. at 202, 121 S.Ct. 2151) (internal quotations omitted). The plaintiff need not prove that "the very action in question has previously been held unlawful," but rather "in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). In other words, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Ibid.*

The undisputed facts in this case do not establish that an exigency existed that excused the police officers from obtaining a search warrant. Just last term the Supreme Court reaffirmed "the well-established principle that 'except in certain carefully defined classes of cases, a search of private property without proper consent

is "unreasonable" unless it has been authorized by a valid search warrant.'" *Groh*, 124 S.Ct. at 1291 (quoting *Camara v. Municipal Court*, 387 U.S. 523, 528–529, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967)). In *Groh*, the Court held that a government agent who searched the plaintiff's home pursuant to a search warrant that did not meet the Fourth Amendment's particularity requirement was not entitled to qualified immunity. The particularity requirement was "clearly established," as the Court had previously defined that term, because " 'it would [have been] clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Id.* at 1293 (quoting *Saucier*, 533 U.S. at 202, 121 S.Ct. 2151).

■ In this case, it should have been apparent that there was no immediate need to enter the plaintiffs' house and that a warrant could have been procured. It should have been obvious to a reasonable officer that entering the plaintiffs' back yard, and later their home, without prior judicial authorization was unlawful in light of the facts known to the police officers at the time. When viewing the facts in the light most favorable to the plaintiff, it does not appear that this was a close case or one that lies along the "hazy border," *Saucier*, 533 U.S. at 206, 121 S.Ct. 2151, that separated immediate action from reasoned assessment. Rather, the plaintiffs' right to be free from the warrantless search in this case was clearly established in this case.

The plaintiffs likewise have satisfied the third stage in the analysis by bringing forth facts supported by sufficient evidence that shows that the defendants' conduct was objectively unreasonable in light of the clearly established rights. As discussed earlier, the defendants demonstrated no more than the mere possibility that an exigency existed, they could point to no specific and articulable facts that would

have led a reasonable, experienced, law enforcement officer to believe that someone inside the plaintiffs' home required immediate assistance, and they entered the home in violation of the time-honored requirement of a search warrant.

The Court finds, therefore, that the individual defendants are not entitled to qualified immunity.

### 3. The traffic stops

As noted earlier, the parties have expressed confusion as to which of the six possible traffic stops form the basis of the harassment claim pleaded in the complaint. Of the six stops, it appears that three of them occurred before the December 31, 2000 home search. The amended complaint refers to the traffic stops as part of the plaintiffs' Section 1983 claim alleging a Fourth Amendment violation. The amended complaint states:

> 25. That *subsequent* to December 31, 2000, Defendants including Defendant John May continued to harass Plaintiffs by conducting unjustified stops and by intentionally locking the Plaintiffs out of their vehicle.

Am. Compl. ¶ 25 (emphasis added). Any claim based on the stops *prior* to December 31, 2000, therefore, is improper, although those prior stops may have some evidentiary value concerning the remaining claims.

Of the remaining three traffic stops, the plaintiffs concede that the August 25, 2003 citation was not improper. Therefore, no claim may be based on that stop.

The two remaining stops are the March 21, 2001 encounter where officer Souser pulled over Causey because of suspicion that Causey was harassing another citizen, and the undocumented stop on a rainy day in March or April 2001 in which May allegedly locked Causey's keys in his car. The Court finds that no constitutional vio-

lation occurred with respect to the first stop, but fact questions preclude dismissal of the claim concerning the second.

The Sixth Circuit has held "[w]hether a traffic stop violates the Fourth Amendment must be evaluated in the same manner as other alleged violations of that Amendment: by undertaking an objective assessment of an officer's actions in light of the facts and circumstances then known to him. The language of the Amendment itself proscribes only unreasonable searches and seizures." *United States v. Ferguson*, 8 F.3d 385, 388 (6th Cir.1993). "[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." *Id.*

Police officers may briefly stop an individual for investigation if they have a "reasonable suspicion" that the individual has committed a crime. *United States v. Palomino*, 100 F.3d 446, 449 (6th Cir.1996). "The same Fourth Amendment test applies to vehicle stops." *Houston v. Clark County Sheriff Deputy John Does 1–5*, 174 F.3d 809, 813 (6th Cir.1999). "Reasonable suspicion" is more than an ill-defined hunch; it must be based upon "a particularized and objective basis for suspecting the particular person ... of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981); *see Houston*, 174 F.3d at 813. It requires "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" an investigatory stop. *Terry*, 392 U.S. at 21, 88 S.Ct. 1868; *United States v. Erwin*, 155 F.3d 818, 822 (6th Cir.1998), *cert. denied*, 525 U.S. 1123, 119 S.Ct. 906, 142 L.Ed.2d 904 (1999). "The standard outlined in *Terry* and its progeny is not onerous." *Houston*, 174 F.3d at 813. The requisite level of suspicion "is considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989); *McPherson v. Kelsey*, 125 F.3d 989, 993 (6th Cir.1997). "Moreover, reasonable suspicion can arise from evidence that is less reliable than what might be required to show probable cause." *Houston*, 174 F.3d at 813 (citing *Alabama v. White*, 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990)); *McPherson*, 125 F.3d at 993.

■ The investigatory stop by officer Souser on March 21, 2001 was based on reasonable suspicion. The plaintiffs have produced no evidence contradicting Souser's deposition testimony that he pulled Causey over because he suspected Causey was harassing a Bay City resident who had called in a complaint. Souser dep. at 93. The plaintiffs contend that Souser's admission that he was not thinking of any specific criminal offense at the time he pulled Causey over and that he was unaware that Causey had violated any traffic ordinances renders the stop unreasonable. However, the fact that Souser was unaware of any traffic violations Causey had committed is irrelevant; the basis for the stop was the investigation of an harassment complaint. Souser need only have a "reasonable suspicion" based upon "a particularized and objective basis for suspecting the particular person ... of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). Here, Souser had received a complaint from a resident that a vehicle fitting the description of Causey's was harassing her. The plaintiffs point to no affirmative evidence that demonstrates the unreasonableness of this stop.

There is no evidence that the alleged stop by officer May in March or April 2001, on the other hand, was justified.

The defendant contends that the incident never occurred. However, the testimony of both plaintiffs creates a fact question that precludes summary judgment by the Court.

### 4. Violation of the Equal Protection Clause

■ In Count 2 of their amended complaint, the plaintiffs allege that the police officers "targeted and treated [them] differently and more harshly as a result of their race." Am. Compl. ¶ 29. The defendants contend that summary judgment on this count is required because the only evidence in the record consists of racial language used during the entry and search of the home.

The Sixth Circuit has recognized that "[t]he Equal Protection Clause of the Fourteenth Amendment provides citizens a degree of protection independent of the Fourth Amendment protection against unreasonable searches and seizures." *United States v. Avery*, 137 F.3d 343, 352 (6th Cir.1997). "[I]f the plaintiffs can show that they were subjected to unequal treatment based upon their race or ethnicity during the course of [the search], that would be sufficient to demonstrate a violation of the Equal Protection Clause." *Farm Labor Organizing Committee v. Ohio State Highway Patrol*, 308 F.3d 523, 533 (6th Cir.2002). The plaintiffs, therefore, must produce some evidence of a discriminatory purpose on the part of the individual defendants. "Discriminatory purpose can be shown by demonstrating that the 'decisionmaker ... selected or reaffirmed a particular course of action at least in part "because of," not merely "in spite of," its adverse effects upon an identifiable group.'" *Id.* at 534 (quoting *Wayte v. United States*, 470 U.S. 598, 610, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985)). Although the Sixth Circuit has held that isolated use of racial epithets does not amount to proof of discrimination in employment cases, *see Jackson v. Quanex Corp.*, 191 F.3d 647 (6th Cir.1999) (Title VII case); *Erebia v. Chrysler Plastic Products Corp.*, 772 F.2d 1250 (6th Cir. 1985) (same), racial slurs alone have been held sufficient to establish a discriminatory purpose in other contexts. *See Smith v. Thornburg*, 136 F.3d 1070, 1090 (6th Cir. 1998) (Section 1985(3) claim). In *Smith*, the plaintiff, an African American male, struggled with an under cover police officer who had mistakenly entered the plaintiff's car thinking it was connected with an on-going drug crime taking place in a residential parking lot. After the plaintiff pulled the police officer out of his car assuming the officer was attempting to steal it, the officer struck the plaintiff and eventually an additional five officers joined the officer in beating and racially slurring the plaintiff. Among other things, the plaintiff claimed the police engaged in conspiracy to deprive him of his civil rights pursuant to Section 1985(3). The Sixth Circuit disagreed with the district court's characterization that there was a total lack of evidence of racial discrimination. The plaintiff testified that he was called a "nigger" and a "drug dealer," and a "black MF" in the process of being arrested. The Court reasoned:

> The alleged racial slurs, standing alone, state an equal protection claim based on racially motivated verbal abuse and harassment. *See Johnson v. Morel*, 876 F.2d 477, 479, 482–84 (5th Cir.1989) ("To state a claim under the Equal Protection Clause, a § 1983 plaintiff must allege that a state actor intentionally discriminated against the plaintiff because of membership in a protected class. Johnson's claim appears to do so. He alleges that Morel humiliated and harassed him, and that the insults and harassment were explicitly racist."), *overruled on*

*other grounds, Harper v. Harris County, Tex.,* 21 F.3d 597 (5th Cir.1994). *Id.* at 1089–90.

Likewise, in this case there is direct evidence of discriminatory purpose animating the search of the house. Plaintiff Causey testified that he was called a "Nigger" when he was placed under arrest and handcuffed; and he testified that while he was detained in his home the police officers were making racial jokes "as far as putting tar all over my body and putting feathers on it. They were making all sorts of derogatory comments." Causey dep. at 77. At this stage of the proceedings, the Court must view this evidence in the light most favorable to the plaintiffs. Doing so, the Court has little difficulty finding the evidence sufficient to warrant a trial on the equal protection claim set forth in Count 2 of the amended complaint.

### 5. Violations of the Michigan constitution

The plaintiffs also have asserted claims under the Michigan constitution. However, the Michigan Supreme Court has held that the state constitution does not create remedies to enforce the rights created therein. *See Jones v. Powell,* 462 Mich. 329, 335–37, 612 N.W.2d 423 (2000). The plaintiffs have conceded this point in their motion papers and at oral argument. The claims based on the Michigan constitution, therefore, will be dismissed.

### III.

The Court finds that the plaintiffs have not brought forth sufficient evidence to withstand summary judgment on their claim against defendants Bay City or Thomas Pletzke. The conspiracy claim was not pleaded with specificity. All but one of the traffic stops described in the evidence submitted by the parties do not give rise to any of the claims for relief stated in the amended complaint. However, the plaintiffs have demonstrated consti-tutional violations arising from the warrantless entry onto their property and search of their home on December 31, 2000, and the defendants are not entitled to qualified immunity. The plaintiffs also have filed a motion to strike one of the exhibits describing police officer training, but that motion is of no consequence given the Court's ruling on the claim of municipal liability based on consideration of the evidence exclusive of that exhibit.

Accordingly, it is **ORDERED** that the defendants' motion for summary judgment is [dkt # 40] is **GRANTED IN PART AND DENIED IN PART.**

It is further **ORDERED** that all claims against defendant City of Bay City are **DISMISSED WITH PREJUDICE.**

It is further **ORDERED** that Count 3 of the amended complaint is **DISMISSED WITH PREJUDICE.**

It is further **ORDERED** that all counts of the amended complaint are **DISMISSED WITH PREJUDICE** respect to defendant Thomas Pletzke.

It is further **ORDERED** that the claims concerning the incidents of December 31, 2000 and January 1, 2001 are **DISMISSED WITH PREJUDICE** as to defendant John May.

It is further **ORDERED** that the plaintiffs' claims relating to traffic stops, except the traffic stop described as occurring in March or April 2001, are **DISMISSED WITH PREJUDICE.**

It is further **ORDERED** that the plaintiffs' motion to strike [dkt # 52] is **DENIED** as moot.

It is further **ORDERED** that the defendants' claims motion for summary judgment is **DENIED** in all other respects.